ACCEPTED
15-25-00018-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/14/2025 6:01 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00018-CV

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/14/2025 6:01:15 PM
CHRISTOPHER A. PRINE
Clerk

PUBLIC UTILITY COMMISSION OF TEXAS,

*Appellant/Cross-Appellee*,

*v.*

CITY OF DENTON, OPERATING AS DENTON MUNICIPAL ELECTRIC,

*Appellee-Cross-Appellant.*

On Appeal from the 459th District Court of Travis County, Texas
The Hon. Maya Guerra Gamble, Presiding Judge, Cause No. D-1-GN-23-008974

# RESPONSE BRIEF OF CROSS-APPELLEE
# PUBLIC UTILITY COMMISSION OF TEXAS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division

July 14, 2025

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

JOHN R. HULME
Assistant Attorney General
State Bar No. 10258400
John.Hulme@oag.texas.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

ATTORNEYS FOR APPELLANT/
CROSS-APPELLEE PUBLIC UTILITY
COMMISSION OF TEXAS

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iv

GLOSSARY OF ACRONYMS AND TECHNICAL TERMS ............................. vii

STATEMENT REGARDING ORAL ARGUMENT ........................................... viii

STATEMENT REGARDING CITATIONS ........................................................ viii

ISSUES PRESENTED ..................................................................................... ix

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS .................................................................................. 3

    I.      Legal and regulatory background ........................................................... 3

           A.     The regulatory structure of the wholesale transmission market. ................................................ 3

           B.     The Commission sets wholesale transmission rates. ............................................................... 5

    II.     Denton Electric's wholesale transmission rate application. ......................................................... 8

STANDARD OF REVIEW ................................................................................. 12

SUMMARY OF THE ARGUMENT .................................................................... 13

ARGUMENT ...................................................................................................... 15

    I.      The Commission Correctly Excluded Denton Electric's Proposed 6% Return on Investment Fund Transfer from Denton Electric's Transmission Revenue Requirement. .................................................. 15

           A.     Denton Electric's 6% return on investment component is not a reasonable and necessary cost for providing transmission service. ................................. 16

    B.    The Commission applied the statutory standard to exclude the 6% return from Denton Electric's transmission rates. ........................................................21

    C.    The Commission's Final Order does not infringe on the City's authority to require Denton Electric to make fund transfers. ....................................25

II.    The Commission has the Statutory Authority Under PURA Chapter 35 to Order Denton Electric to File an Interim Transmission-Cost Application. ..............................................26

PRAYER ................................................................................34

CERTIFICATE OF COMPLIANCE .................................................36

CERTIFICATE OF SERVICE ........................................................37

INDEX TO APPENDIX ...............................................................38

# TABLE OF AUTHORITIES

**Cases**

*City of El Paso v. Pub. Util. Comm'n of Tex.*,
883 S.W.2d 179 (Tex. 1994) ....................................................................13

*Edgewood Indep. Sch. Dist. v. Meno*,
917 S.W.2d 717 (Tex. 1995) ....................................................................28

*Elec. Reliability Council of Tex., Inc. v. Panda Power Generation
Infrastructure Fund, LLC*,
619 S.W.3d 628 (Tex. 2021) ....................................................................27

*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*,
53 S.W.3d 310 (Tex. 2001) ............................................... 4, 5, 29, 32

*Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*,
901 S.W.2d 401 (Tex. 1995) ....................................................................16

*Pub. Util. Comm'n of Tex. v. Hous. Lighting & Power Co.*,
748 S.W.2d 439 (Tex. 1987) ............................................................. 16, 24

*Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*,
620 S.W.3d 418 (Tex. 2021) ....................................................................12

*San Antonio Indep. Sch. Dist. v. City of San Antonio*,
550 S.W.2d 262 (Tex. 1976) ....................................................................20

*State of Texas v. Pub. Util. Comm'n of Tex.*,
883 S.W.2d 190 (Tex. 1994) ....................................................................29

*Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*,
652 S.W.2d 358 (Tex. 1983) ............................................. 16, 17, 24, 26

*Sw. Elec. Power Co. v. Grant*,
73 S.W.3d 211 (Tex. 2002) ....................................................................29

*Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*,
616 S.W.3d 558 (Tex. 2021) ............................................................. 14, 28

*Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*,
253 S.W.3d 184 (Tex. 2007) ............................................................. 5, 6, 29

*Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*,
511 S.W.3d 28 (Tex. 2017) ....................................................................28

*Valley Baptist Med. Center v. Gonzalez*,
    33 S.W.3d 821 (Tex. 2000) ...................................................................26

**Constitutional Provisions & Statutes**

16 Tex. Admin. Code § 25.73(b) ..............................................................30

16 Tex. Admin. Code § 25.192(c) ............................................... 6, 14, 25

16 Tex. Admin. Code § 25.192(c) ............................................... 6, 14, 25

16 Tex. Admin. Code § 25.192(c)(1) & (2) ...............................................18

16 Tex. Admin. Code § 25.192(c)(2) .........................................................21

16 Tex. Admin. Code § 25.247 ................................................... 34, 29

16 Tex. Admin. Code § 25.247(d)(1) .........................................................29

16 Tex. Admin. Code § 25.247(d)(2) .........................................................29

Tex. Gov't Code § 1502.057 ....................................................................25

Tex. Gov't Code § 1502.059 ...................................................... 7, 8, 25

Tex. Gov't Code § 2001.174 .....................................................................13

Tex. Gov't Code § 2001.174(2) .................................................................27

Tex. Util. Code § 11.002(a) ...................................................... 4, 30

Tex. Util. Code § 11.003(20) ......................................................................7

Tex. Util. Code § 15.001 ...........................................................................12

Tex. Util. Code § 25.192(h)(1) ....................................................................7

Tex. Util. Code § 33.001 .............................................................................5

Tex. Util. Code § 33.002 .............................................................................4

Tex. Util. Code § 35.006 ...........................................................................15

Tex. Util. Code § 35.004(a) ....................................................... 22, 23

Tex. Util. Code § 35.004(a)-(b) ...................................................................6

Tex. Util. Code § 35.004(b) ......................................................................31

Tex. Util. Code § 35.004(c) ........................................................... passim

Tex. Util. Code § 35.004(c)-(d) ........................................................................30

Tex. Util. Code § 35.004(d) ..............................................................................6

Tex. Util. Code § 35.004.; 16.........................................................................25

Tex. Util. Code § 35.004.; 16.........................................................................14

Tex. Util. Code § 35.006 .................................................................................15

Tex. Util. Code § 35.006(a) .............................................................................30

Tex. Util. Code § 36.157 .................................................................................31

Tex. Util. Code § 36.157(e) .............................................................................31

Tex. Util. Code § 39.151 ...................................................................................4

Tex. Util. Code § 40.004(1) ...........................................................................4, 5

# GLOSSARY OF ACRONYMS AND TECHNICAL TERMS

| Term | Meaning |
|---|---|
| ALJs | Administrative Law Judges |
| City | City of Denton |
| Commission | Public Utility Commission of Texas |
| Denton Electric | City of Denton, operating as Denton Municipal Electric |
| ERCOT | Electric Reliability Council of Texas |

## STATEMENT REGARDING ORAL ARGUMENT

The Commission respectfully requests oral argument. This case involves the complex statutory and regulatory scheme surrounding how the Commission sets a utility's wholesale transmission rates. Oral argument will provide an opportunity for the Commission to answer questions regarding its transmission rate application procedures to aid in the Court's decision-making process.

## STATEMENT REGARDING CITATIONS

In this brief, citations to the Clerk's Record will be in the following form: CR at [Page number]. Citations to the Supplemental Clerk's Record will be in the following form: Suppl. CR at [Page number]. Citations to the Reporter's Record will be in the following form: RR at [Page number]. Citations to the Administrative Record, which was admitted into evidence and is contained in the Reporter's Record, will be in the following form: RR, AR [Item number] at [Page number]. All cited page numbers refer to the document's original page numbers when practical. Otherwise, the PDF page number will be cited in the following form: RR, AR [Item number] at PDF [Page number].

## ISSUES PRESENTED

1.  Was the Commission's exclusion of Denton Electric's requested 6% return on investment when determining Denton Electric's transmission cost of service supported by substantial evidence and based upon applicable law and reasoned decision-making?

2.  Does the Commission's authority to set wholesale transmission rates include the authority to order Denton Electric to file an interim transmission rate application?

## INTRODUCTION

In this appeal of a Public Utility Commission of Texas ("Commission") Final Order setting Denton Municipal Electric's ("Denton Electric") wholesale transmission rates, the district court agreed with the Commission and the two Administrative Law Judges ("ALJs") who heard the evidence and found that Denton Electric had not established that its requested 6% general fund transfer was a reasonable and necessary transmission expense. The district court also agreed with the Commission and the ALJs' determination that Denton Electric must file an interim transmission rate proceeding within 90 days of issuance of the Final Order. Both findings are proper and should be affirmed.

In this proceeding, Denton Electric sought to establish a new transmission cost of service. This was Denton Electric's first comprehensive rate case since 2005. The underlying administrative proceeding was long and contentious, originating from the Commission's suspicion that Denton Electric was over-recovering on its transmission rates. However, that this was the origin of the proceeding does not mean that any of the conclusions in the Commission's order setting Denton Electric's transmission rates relied on this basis. Denton Electric acknowledged it was charging rates that did not represent its current operating structure when it submitted its rate application requesting a substantial one-third reduction from its annual transmission revenue requirement, or $22.5 million. But this was not the

1

reason the Commission took the challenged actions, and Denton Electric can point to no finding of fact or conclusion of law in the Final Order to support that contention.

Regardless of why the application was filed, once the contested case began, Denton Electric had the burden to prove that its requested transmission cost of service was just and reasonable and reflected only expenses that were reasonable and necessary for the provision of transmission service. The Commission considered the record before it and determined that Denton Electric did not meet the burden with regard to the requested 6% return on investment component of its general fund transfer. The Commission did not adopt any "new standard" or punitively target Denton Electric to exclude the 6% fund transfer from Denton Electric's revenue requirement. This conclusion is well within the Commission's statutory duty to ensure that Denton Electric only recover its reasonable and necessary costs of providing transmission service.

Denton Electric's application was filed in 2021 using data from 2020, but the Final Order was not issued until 2023. Due to the significant delays in the administrative proceeding, the ALJs were concerned that the information Denton Electric had provided in its application had become stale and no longer reflected Denton Electric's current operating costs. Thus, the Commission applied Rule 25.247 and found that it was in the public interest for Denton Electric to submit an

interim application so that its rates would more accurately reflect its current operating costs. The Commission's authority to initiate a transmission rate proceeding is based on its statutory duties and authority under the Public Utility Regulatory Act ("PURA").

PURA charges the Commission to ensure that wholesale transmission rates are just and reasonable. Additionally, the Commission has the express authority to set the wholesale transmission rates for all utilities that operate within the Electric Reliability Council of Texas ("ERCOT") market. Necessarily implied in the Commission's authority to set wholesale transmission rates, and its duty to ensure rates are just and reasonable, the Commission has the authority to order a transmission-providing utility to file an application to update its rates. Otherwise, the Commission would be without power to exercise its statutory duties, and overcharging utilities could avoid any oversight or adjustment to their rates by simply not filing a transmission rate application.

STATEMENT OF FACTS

I.     **Legal and regulatory background**

A.     **The regulatory structure of the wholesale transmission market.**

In 1975, in response to consumers being burdened by high electricity rates, the Texas Legislature enacted PURA to create a comprehensive regulatory scheme over the electric industry. PURA created the Commission and charged it with the

3

general power to regulate and supervise the utilities within its jurisdiction to ensure that electricity rates were just and reasonable. Tex. Util. Code § 11.002(a). By default, municipalities are outside the jurisdiction of the Commission and can regulate retail rates within their service areas, but a municipality can surrender its regulatory authority to the Commission. Tex. Util. Code § 33.002. However, the Commission was granted jurisdiction over municipally owned utilities in certain circumstances, including the regulation of wholesale transmission rates. Tex. Util. Code § 40.004(1).

The electric industry consists of three components: (1) power generation, (2) power transmission, and (3) power distribution. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001). The component at issue here is power transmission, which "involves transporting electricity over a utility's power lines." *Id.* To better facilitate power transmission, "Texas's electric utilities have voluntarily interconnected their transmission systems" into a single power grid covering about 85% of the State. *Id*. ERCOT is the statutorily authorized independent operator that oversees and administers the State's transmission network. Tex. Util. Code § 39.151.

But before power is transmitted, it must be sold. These sales are classified as either a retail or wholesale transaction. Retail transactions are the sale of electricity

4

to end-use-consumers while wholesale transactions are between electric market participants. This suit concerns the latter.

Although municipalities that own electric utilities have authority to set their utilities' transmission rates for *retail* transactions, Tex. Util. Code § 33.001, the Commission has jurisdiction to set the rates for *wholesale* transactions—that is, the "wholesale transmission rates," *id.* § 40.004(1); *see also Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 187 (Tex. 2007). Retail rates affect only a particular utility's customers but wholesale rates affect all ERCOT customers in the State. That is because transmission rates are paid by other providers that use the transmission system and are passed on to all electric consumers in the ERCOT market. In other words, Denton Electric controls the rates it charges its retail customers, but the Commission controls the transmission rates Denton Electric charges everyone else.

### B. The Commission sets wholesale transmission rates.

"Because not all wholesale transactions occur between a buyer and seller whose transmission networks are directly interconnected, and because some power generators own no transmission lines, buyers and sellers must often transmit . . . power across transmission facilities belonging to third parties." *City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d at 312. To facilitate the transmission of electricity across third parties' power lines, PURA requires all transmission owning

5

utilities to provide "open access" to their transmission facilities. *Tex. Mun. Power Agency*, 253 S.W.3d at 187; Tex. Util. Code § 35.004(a)-(b). This allows electricity to freely flow across the electric grid and permits utilities to purchase power from remote sellers without obtaining individual transaction agreements. *Tex. Mun. Power Agency*, 253 S.W.3d at 187.

And to further facilitate the free flow of electricity, statute requires the Commission to set wholesale transmission rates at a flat rate regardless of the distance the electricity travels on the ERCOT grid. Tex. Util. Code § 35.004(d). Under this method, a transmission-owning utility's rate is based on ERCOT's total system-wide costs divided by its total system-wide demand. *Id*. The Commission sets wholesale transmission rates for transmission service providers based on those providers' "transmission cost of service." *Id.* Utilities are only permitted to recover the reasonable and necessary costs of providing transmission service by including those costs in their wholesale transmission rates. Tex. Util. Code § 35.004(c).

A utility's transmission cost of service, or revenue requirement, is calculated using allowable expenses and a return on invested capital. 16 Tex. Admin. Code § 25.192(c). The categories of expenses that can be used in calculating a utility's reasonable and necessary transmission costs include: (1) transmission operation and maintenance expenses plus depreciation; (2) federal income tax and other associated taxes; and (3) the Commission-allowed rate of return. *Id*. This allows providers to

recover both the costs they incur in the management and maintenance of their transmission systems and an appropriate return on investment. These costs are based on a historic test year, which gives a "snapshot" of what the operating expenses are. *See* Tex. Util. Code § 11.003(20). Additionally, utilities are permitted to file interim proceedings to add transmission investments into the utility's rate base, but they retain the rate of return authorized under the comprehensive rate case. *Id.* § 25.192(h)(1).

Utilities are permitted to include "fund transfers" in their transmission revenue requirement under some circumstances. A fund transfer is the transfer of revenue from a municipally owned utility to the municipality's general fund. Tex. Gov't Code § 1502.059. Fund transfers are referred to by different names, and calculated in different ways, depending on the terms and conditions of the city ordinance or policy that created it. RR, AR Item 113 at 8:25-9:4. Under these policies, municipalities can include fund transfers in the retail rates they charge their own residents. In other words, fund transfers are a way for municipalities to transfer utility revenues to the municipality's coffers for general use. But to determine whether a municipally owned utility can include such a transfer in wholesale transmission rates, the Commission evaluates the stated purpose of the transfer and the reasonableness of the proposed transfer in light of that purpose. Whether, and to what extent, a municipally owned utility can include a fund transfer in its

transmission revenue requirement depends on if the purpose is related to providing transmission service. RR, AR Item 113 at 12:16-18. The Commission makes these determinations on a case-by-case basis based on the evidence presented.

## II. Denton Electric's wholesale transmission rate application.

Denton Electric's last comprehensive transmission rate application was in 2005. In that case, Denton Electric was awarded a 28.05% authorized rate of return on its invested capital. RR, AR Item 219 at 4. In the years following Denton Electric's 2005 rate case establishing its rate of return, Denton Electric came before the Commission for numerous updates to its wholesale transmission rates to add additional transmission facility investment to its rate base.[1] During this time, Denton Electric's operational and financial circumstances changed significantly, with its transmission revenues increasing by thirteen times and its rate base growing by sixteen times. RR, AR Item 219 at 2. While the 28.05% authorized rate of return may have been appropriate when it was set in 2005 when Denton Electric was a relatively small utility, by 2019, it was out of line with the returns approved for other comparable utilities in the state and the changes and growth in the intervening years to Denton Electric's operations. *Id.*

---

[1] Denton Electric has filed an interim TCOS application every year since 2014 (Docket Nos. 42770, 45071, 46348, 47900, 48963, 50110, 51345, 52449).

The Commission suspected that Denton Electric was over-recovering based on Commission staff's review of Denton Electric's 2019 earnings monitoring report, but outside of a comprehensive rate proceeding, the Commission is limited to reviewing only a small amount of financial information a municipally owned utility provides the Commission in its annual earnings reports. RR, AR Item 112 at 21:13-16. Therefore, on October 16, 2020, the Commission ordered Denton Electric to file a comprehensive transmission rate application by November 1, 2021, based on a test year ending on September 30, 2020, to determine whether Denton Electric was over-recovering.

On November 1, 2021, Denton Electric complied with the Commission's order and filed a comprehensive rate application. RR, AR Item 2. Denton Electric's rate application tacitly admitted that it was over-recovering—it requested a transmission revenue requirement of $37,227,597, RR, AR Item 199 at 8:14-9:2, a reduction of $22.5 million per year from its previously approved revenue requirement of $59,752,472. RR, AR Item 112 at 18:18-19. However, the Commission's ability to set lower rates was delayed by Denton Electric's failure to provide a required depreciation study. After months of delay, on May 12, 2022, the Commission issued an order requiring Denton Electric to amend its application to include a depreciation study. RR, AR Item 45 at 3.

On December 1, 2022, six months after the Commission's order, Denton Electric filed an amended application including a depreciation study. RR, AR Item 90. Denton Electric's amended application also modified the original application by requesting a transmission revenue requirement of $38,446,435—an increase of $1.2 million from its original application. RR, AR Item 113 at 4:3.

In the amended application, Denton Electric requested to include an 11% fund transfer in its transmission revenue requirement as an expense item categorized as "taxes other than income." *See* RR, AR Item 90 at PDF 256. The proposed expense was composed of a 5% "franchise fee" to use the City's rights-of-way and a 6% return on investment. RR, AR Item 113 at 9:15-17. These fund transfers are used to help fund municipal government operations. RR, AR Item 199 at 24:14-18. The City charges the franchise fee to *non*-municipally owned utilities, and the City sought to create an even playing field between these utilities and Denton Electric (which would have to pay the fee too were it not municipally owned). RR, AR Item 207 22:6-8. The 6% return on investment component, on the other hand, was designed to provide a return to the taxpayers of the City for their guarantee of debt obligations by requiring Denton Electric to make annual payments to the City if it has excess revenue. RR, AR Item 117 at 13:20-21; *see* RR, AR Item 113 at 11:4-7, 12:18-21.

In a hearing held at the State Office of Administrative Hearings, Commission staff recommended that the 5% franchise fee be included in Denton Electric's

transmission revenue requirement, but that the 6% return on investment component be excluded. Ruth Stark, Commission staff's expert witness, explained the franchise fee was related to the provision of transmission service and that Denton Electric had supplied evidence supporting that 5% number was consistent with what the City charges other utilities. *Id*. at 12:8-12.

But, as Ms. Stark further explained, the 6% return on investment component was not related to the actual cost of providing transmission service but was merely additional revenue for the City to fund local government functions. *Id*. at 13:3-5. And Denton Electric did not demonstrate the reasonableness of an additional return on top of its Commission-approved rate of return using the debt service coverage method. *Id*. at 13:7-10. Ms. Stark concluded that the fact that the City requires Denton Electric to make these payments if it has excess revenues after expenses does not make it reasonable for all ratepayers in ERCOT to pay this additional return just so that the City can fund its general operations. *Id*. at 13:10-13.

The two ALJs who presided over the hearing agreed. Their proposal for decision found that Denton Electric did not establish that the 6% return on investment component was "related to the actual provision of service or the cost of service" and recommended it be excluded from Denton Electric's transmission revenue requirement. RR, AR Item 146 at 2, 21. The proposal for decision also recommended that Denton Electric be required to file an interim transmission rate

application, citing concerns that delays in the application may have rendered Denton Electric's historic test year data an unreliable representation of its current cost of providing service. *Id*. at 2, 40. As the proposal for decision explained, an interim application based on a more current test year would ensure that Denton Electric's rates accurately reflect its current operating costs. *Id*. at 39. And, as the ALJs noted, Denton Electric had filed an interim application every year since 2014, which suggested that initiating another such proceeding would not be overly burdensome. *Id*. at 40.

The Commission adopted a modified version of the proposal for decision that was consistent with the ALJs' findings and issued its Final Order. RR, AR Item 159. On judicial review, the district court affirmed the exclusion of the return on investment component of the fund transfer and the requirement that Denton Electric file an interim rate application within 90 days of the Final Order.

## STANDARD OF REVIEW

Courts accord the Commission's "decisions in contested rate cases particular deference under the statutory 'substantial evidence' standard." *Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*, 620 S.W.3d 418, 426 (Tex. 2021) (citations omitted); Tex. Util. Code § 15.001. The substantial-evidence standard is one "of limited judicial review," under which a court may not "reverse the Commission's rate determination unless it prejudices the [utility's] substantial rights." *Id.* (citing

12

Tex. Gov. Code § 2001.174). And such prejudice does not occur unless the decision is "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole" or it is arbitrary or capricious. *Id.* (citing Tex. Gov. Code § 2001.174).

In other words, a court "must uphold the Commission's decision if 'there is some reasonable basis in the record for the action taken by the agency.'" *Id.* (citation omitted). Furthermore, a court presumes that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence. *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 185 (Tex. 1994). And the burden to prove otherwise is on the utility challenging the Commission's decision. *See id.*

## SUMMARY OF THE ARGUMENT

The Commission reasonably determined that the 6% return on investment component of the fund transfer was not a reasonable and necessary cost of providing transmission service and that Denton Electric was required to file an interim transmission rate application.

**I.** Texas statute permits Denton Electric to recover only costs in its transmission rates that are reasonable and necessary for providing transmission service. Tex. Util. Code § 35.004(c). But the 6% return on investment component is not a transmission cost at all. Rather, it pays for local government functions unrelated to providing transmission service—and the transfer only occurs *after* all

13

necessary expenses, including bond payments, are made. RR, AR Item 113 at 12:18-21. Denton Electric is accurate in calling it a return but is incorrect in suggesting that removing this as a separate expense item in its transmission revenue requirement deprives Denton Electric of a fair return. Denton Electric is *already receiving* a return on investment—through the 6.21% rate of return authorized by the Commission's Final Order. RR, AR Item 159 at 8. But Denton Electric seeks to double-dip by asking for an *additional* 6% return on investment on top of its 6.21% rate of return. And although Denton Electric is allowed to transfer funds to the City, those transfers are not transmission costs. *See* Tex. Util. Code § 35.004.; 16 Tex. Admin. Code § 25.192(c). At bottom, Texas law does not permit the City to use Denton Electric to fund itself by charging higher transmission rates to every ratepayer in ERCOT.

**II.** The year-long delay in the Commission's rate proceeding caused the historic test year to be older than usual and led to concerns about the data's staleness. And because the Texas Administrative Code allows the Commission to require a utility to file a rate application if the Commission determines it is in the public interest to do so, the Commission required Denton Electric to file an interim rate application after it released its Final Order. RR, AR Item 159 at 9. Denton Electric challenges this requirement by arguing that the Commission has no authority to initiate a rate proceeding. But the Commission's rule is presumptively valid, *Tex.*

14

*Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 568 (Tex. 2021), and was validly adopted, *see* Tex. Util. Code § 35.006.

To fulfill its obligations of regulating the wholesale transmission market, the Commission has the authority to order a utility that participates in the ERCOT wholesale market to appear before the Commission to review the utility's rates. This power is necessary so that the Commission can review and adjust rates that may no longer be reflective of a utility's operating costs to ensure that rates remain just and reasonable. The Commission reasonably exercised these powers—not only by calling Denton Electric in for a much-needed review of its transmission costs, but also by ensuring that going forward Denton Electric's rates will be based on more recent information.

## ARGUMENT

**I.    The Commission Correctly Excluded Denton Electric's Proposed 6% Return on Investment Fund Transfer from Denton Electric's Transmission Revenue Requirement.**

Under Texas law, Denton Electric may only recover expenses through its transmission rates that are reasonable and necessary for providing transmission service. Tex. Util. Code § 35.004(c). But the return on investment fund transfer is not even a transmission cost. In resisting this straightforward rule, Denton Electric erroneously conflates the City's authority to require fund transfers (which are only made after expenses if there are excess revenues), with its right to include those fund

15

transfers in its transmission rates. But the authority to make these transfers does not mean that Denton Electric can recover the transfers from every ratepayer in ERCOT through its wholesale transmission rates.

A. **Denton Electric's 6% return on investment component is not a reasonable and necessary cost for providing transmission service.**

Texas statute grants the Commission broad powers and discretion in regulating public utilities that extends throughout the ratemaking process. *Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*, 901 S.W.2d 401, 409 (Tex. 1995). When the Commission exercises its power to set a utility's just and reasonable rates, the utility is entitled to rates that allow it to recover its reasonable and prudent operating expenses. *Pub. Util. Comm'n of Tex. v. Hous. Lighting & Power Co.*, 748 S.W.2d 439, 441 (Tex. 1987). However, not all expenses incurred by a utility can be categorized as reasonable operating expenses. *Id*. Consequently, the Commission's discretion in the ratemaking process includes the authority to disallow improper expenses. *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 362 (Tex. 1983). Furthermore, utilities are only allowed to recover through their rates expenses that are actually incurred, or which can be anticipated with reasonable certainty. *Id*. Thus, when a utility requests to include an expense in its rates, it must show that the expense is actual, necessary, and reasonable. *Id*. at 363.

Denton Electric's proposed 6% return on investment fails these requirements. First, by its own terms, the 6% return is not an operating *expense* at all. Rather it is

16

a payment made from *excess* revenue left over after Denton Electric has paid all its operating expense and debt service requirements. RR, AR Item 113 at 11:4-7, 12:18-21. The 6% return is a discretionary payment that Denton Electric can make from its excess revenue, not a mandatory 6% expense that Denton Electric incurs as a cost of providing transmission service.

Second, even if the return qualified as an expense at all, it would not be a necessary one. The stated purpose of these transfers is to provide funds for City government operations, RR, AR Item 113 at 10:6-8—not to provide transmission service. This purpose is illustrated by the fact that in 2020, anticipating municipal revenue shortfalls caused by the COVID-19 pandemic, the City temporarily raised the return rate from 3.5% to 6% to make up for the shortfall. *Id*. at PDF 32. The City made this change permanent in 2022. *Id*. at 10:1-4. Denton Electric provided no evidence linking the revenue shortfall to the cost of transmission service or explaining why it raised the return rate only for Denton Electric but not the City's water or wastewater utilities. *Id*. at 11:18-22.

Accordingly, as Ms. Stark explained, the proposed 6% return on investment component is merely additional compensation to the City that is not justified by the actual cost of providing transmission service. RR, AR Item 113 at 13:4-5. Although Denton Electric argued that the fund transfer "represent payments to the taxpayer in exchange for the City's implied or explicit guarantee of the bonds to support

17

transmission investments," the ALJs correctly concluded that this rationale "is too tenuous and theoretical to support the requested cost recovery in rates." RR, AR Item 146 at 21. Moreover, the ALJ noted that "this theory is contrary to the City's ordinance language that states the [return on investment fund transfer] was being increased from 3.5% to 6% in order to 'address the projected revenue shortfalls' associated with the COVID-19 pandemic." *Id*. at 21-22. Put simply, Denton Electric failed its burden to prove that recovering the 6% return would be reasonable.

There is a distinction between a utility's expenses and a utility's reasonable rate of return on invested capital. What Denton Electric is attempting to do is double its *rate of return* by first including the 6% return on investment fund transfer as an *expense* item and then recovering, on top of that, its Commission-approved 6.21% rate of return. *See* RR, AR Item 159 at 8. The Commission's rule provides multiple methods for a municipally owned utility to choose from to calculate its rate of return. *See* 16 Tex. Admin. Code § 25.192(c)(1), (2). Denton selected in its application to use the debt service coverage method. Using this method, the Commission calculated Denton's reasonable rate of return at 6.21%. RR, AR Item 159 at 8.

Denton Electric's analogy between the fund transfer and dividend payments that an investor-owned utility makes to its shareholders, Cross-Appellant Br. 42, was rebutted by testimony and rejected by the ALJs and the Commission. RR, AR Item 146 at 22. Office of Public Utility Counsel witness Mark Garrett explained that

Denton's analogy is flawed because an investor-owned utility's dividend payments are made out of its return—they are not an additional expense on top of its return. RR, AR Item 110 at 9:13-15. In other words, investor-owned utilities do not include dividend payments as an expense item that they can recover through their transmission rates, and the Commission does not guarantee that shareholders receive dividend payments. Denton Electric received a rate of return of 6.21% and, like its investor-owned counterparts, it can make fund transfers from that return. But it cannot receive an additional return of 6% by including the fund transfer as a separate expense item. RR, AR Item 113 at 13:7-10.

In a final effort to justify the inclusion of the fund transfer in its revenue requirement, Denton Electric argues that the transfer is equivalent to ad valorem taxes that an investor-owned utility would pay to the City. Cross-Appellant Br. 40. But, as the ALJs pointed out, Denton Electric "provided no such information related to either the dollar amount of ad valorem taxes or other taxes and fees paid by other utilities to the City that would support a contention that the 6% [return on investment fund transfer] is in any way comparable to those utilities' expenses." RR, AR Item 146 at 16. And the City itself described the 6% fund transfer as a "return on investment"—not an ad valorem tax. *See* RR, AR Item 117 at 13:20-21. Based on Denton Electric's lack of evidence, the Commission correctly concluded that the 6% fund transfer was not reasonable. RR, AR Item 159 at 7.

19

In arguing that the Commission has no authority to exclude fund transfers, Denton Electric misplaces its reliance on *San Antonio Independent School District v. City of San Antonio*. As an initial matter, that case was decided nearly three decades before the Legislature enacted PURA § 35.004 granting the Commission authority to set a municipally owned utility's wholesale transmission rates. Additionally, the case was dealing with the *retail* rates that a municipally owned utility charges its customers and the recovery of fund transfers through those retail rates. *See San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262 (Tex. 1976). But most importantly, the Supreme Court expressly stated that the reasonableness of the fund transfer in question *was not at issue* in the case. *Id*. at 264. The only issue was whether a municipally owned utility *can* recover fund transfers in its rates. *Id*. The Court explained that "[u]pon proper pleading and record, if the City's return were proved to be excessive and unreasonable, the courts could grant relief." *Id*. at 265. However, "[b]ecause petitioners are not complaining of the reasonableness of the rates or of the return to the City, they are in no position to complain of the amount of some component of that rate or return." *Id*. at 266.

In this case, the reasonableness of Denton's requested 6% fund transfer *is* at issue, and there is nothing in *City of San Antonio* that prohibits the Commission from excluding an unreasonable expense. Denton Electric was granted a 6.21% rate of return using the debt service coverage method—the City is not being denied the

20

opportunity to receive a reasonable profit for its ownership of Denton Electric. What it is being denied is its unreasonable attempt to recover an *additional* 6% return as a separate expense item on top of its Commission-approved rate of return.

**B. The Commission applied the statutory standard to exclude the 6% return from Denton Electric's transmission rates.**

The fund transfer question here is an issue of first impression. As Denton Electric acknowledges, the Commission has never had a contested case in which a municipally owned electric utility challenged the exclusion of a fund transfer from its expense calculation. *See* Cross-Appellant Br. 48 n.11. In fact, Denton Electric cites only cases permitting utilities to recover fund transfers that resulted from settlement agreements or were otherwise uncontested. RR, AR Item 153 at 9. In those prior settlement agreements, the Commission has approved, excluded, or not addressed fund transfers at all. *Id*. at 7.

Denton Electric cannot rely on unrelated settlement agreements because every fund transfer is unique. The fact that the Commission has approved certain fund transfers through settlement agreements in other cases does not mean that the Commission must approve Denton Electric's fund transfer here. Moreover, many other cases are not comparable because some utilities choose a different method to calculate their rate of return that includes fund transfers within the rate of return— not as a separate expense item on top of the Commission-approved rate of return as requested by Denton Electric. 16 Tex. Admin. Code § 25.192(c)(2); RR, AR Item

21

206 at 16 (rate filing package describing the cash flow method). Applying the statutory reasonable-and-necessary expense requirement, Tex. Util. Code § 35.004(c), the Commission properly concluded that Denton Electric's 6% fund transfer should be excluded from its transmission revenue requirement.

This did not somehow shift the costs to its other customers, as Denton Electric claims, Cross-Appellant Br. 55-56, for the simple reason that the 6% return on investment is not a cost of transmission service. Denton Electric wrongly asserts that by excluding the fund transfer from its rates, the Commission is violating the portion of PURA § 35.004(c) that requires the utility's other customers not bear the utility's *transmission costs* and PURA § 35.004(a), which requires a utility to provide wholesale transmission service at rates that are comparable to the rates of the utility's own use of its system. But the 6% return on investment is not a cost that should be charged to transmission customers. It has nothing to do with the provision of transmission service at all.

Moreover, Denton Electric's reference to retail rates is a red herring. The title of PURA § 35.004 is "Provision of Transmission Service." Thus, under the statute's plain language, the only reasonable interpretation is that the statute only applies to transmission service. Section 35.004(a) merely requires that a utility provide wholesale transmission customers the same service and access and at the same rates that it would charge itself for use of its own transmission system. Tex. Util. Code §

22

35.004(a); *see also* RR, AR Item 134 at 14. It does not apply to, or make any reference to, the rates that a utility should charge retail customers and does not require comparing the rates a utility charges retail customers and transmission customers. Additionally, the provision in PURA § 35.004(c) that relates to the "utility's other customers" refers to the utility's other transmission customers. Tex. Util. Code § 35.004(c); *see also* RR, AR Item 134 at 15. For the same reasons as Section 35.004(a), this section does not refer to the rates that a utility charges its retail customers and does not require that rates charged to retail customers be comparable to transmission rates. Denton Electric's interpretation is contrary to the plain language and the Commission's authority under Chapter 35.

Taken together, these provisions simply state that a utility cannot charge transmission customers more than what it would charge itself for transmission service and cannot charge different transmission customers different rates. RR, AR Item 134 at 15. They do not authorize Denton Electric to recover—in its wholesale transmission rates—costs that are not reasonable and necessary costs of providing wholesale transmission service.

This is not the application of some purportedly "new standard" as alleged by Denton Electric. Cross-Appellant Br. 47-48 The Commission applied the plain language of PURA § 35.004(c), which allows a utility to recover in its transmission

rates only the costs that are reasonable and necessary for providing transmission service.

In evaluating Denton Electric's request, Ms. Stark recited a Commissioner's statement from another proceeding that the requested expense must have a "specific rationale" related to providing transmission service. RR, AR Item 113 at 12:15-18. As the ALJs pointed out, this should not be a matter of controversy; the requirement that Denton Electric provide a specific rationale is plainly based on the Commission's statutory authority to review wholesale transmission rates. RR, AR Item 146 at 21. Surely Denton is not arguing that it does not need to provide a basis for its requested expenses and that it can recover expenses that are not reasonable and necessary for providing transmission service. The fact that the Commission requires utilities to provide justification for their requested expenses is inherent in the very nature of a ratemaking proceeding. *See*, *e.g.*, *Suburban Util. Corp.*, 652 S.W.2d at 363 ("If the expense *can be shown* to be actual, necessary, and reasonable it should be allowed.) (emphasis added); *Hous. Lighting & Power Co.*, 748 S.W.2d at 441 ("When a utility *can demonstrate* an increased level of reasonable and prudent operating expenses, its rate will be raised.") (emphasis added). Thus, the Commission's conclusion that Denton Electric must provide support for its requested expenses is *necessary* for the Commission to determine whether those expenses are reasonable and necessary.

**C.** **The Commission's Final Order does not infringe on the City's authority to require Denton Electric to make fund transfers.**

Denton Electric conflates two separate and unrelated statutes to argue that the Commission has no authority to exclude fund transfers from transmission rates. But the Commission has the statutory duty to determine what expenses are reasonable and necessary for providing transmission service. Denton Electric's legal authority to make a fund transfer does not mean that it is reasonable for Denton Electric to charge all ratepayers in the ERCOT region the costs of the fund transfer. Denton Electric is correct that municipally owned utilities are authorized to make transfers of revenue to a city's general fund. *See* Tex. Gov't Code § 1502.059. But the mere fact that Denton Electric can make fund transfers says nothing about whether those transfers are recoverable expenses. The Texas Government Code does contain requirements for what must be included in a municipally owned utility's rates, but the list does not include a fund transfer. *See* Tex. Gov't Code § 1502.057. More importantly, the statutes and rules related to wholesale transmission rates never reference fund transfers. *See* Tex. Util. Code § 35.004; 16 Tex. Admin. Code § 25.192(c). That makes sense, given that ratepayers across ERCOT should not bear the cost of Denton Electric's fund transfers to the City. These transfers have nothing to do with transmission service.

Because fund transfers are not one of the three enumerated categories of reasonable and necessary expenses, *see* 16 Tex. Admin. Code § 25.192(c), it is

within the Commission's discretion to determine whether a fund transfer is reasonable and necessary on a case-by-case basis, *Suburban Util. Corp.*, 652 S.W.2d at 362 ("The PUC's ratemaking power includes the discretion to disallow improper expenses."). If the Commission did not have such discretion, municipally owned utilities would have virtually unlimited taxing power over citizens outside the municipality's jurisdiction through the inclusion of arbitrarily high fund transfers in its wholesale transmission rates.

Using its discretion, the Commission determined that substantial evidence showed that Denton Electric's payments made from excess revenue were not expenses at all, must less reasonable and necessary one. Therefore, the Commission's conclusion was within its authority, supported by substantial evidence, and the Court should affirm the district court's order affirming this provision in the Commission's Final Order.

II.     **The Commission has the Statutory Authority Under PURA Chapter 35 to Order Denton Electric to File an Interim Transmission-Cost Application.**

As an initial matter, this issue is moot because Denton Electric has already complied with the Commission's Final Order and filed and completed an interim rate proceeding. *See Valley Baptist Med. Center v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) (holding that an appeal of a trial court's discovery order was moot and there was no longer a live controversy between the parties because the appellant had

complied with the order). The Commission issued its notice of approval for Denton Electric's interim rate application on March 4, 2024.[2] Denton did not file a motion for rehearing or challenge the notice of approval. Furthermore, the Court cannot grant the relief requested by Denton Electric to reverse its rates established in that interim rate proceeding. Cross-Appellant Br. 70. Under the Administrative Procedure Act, the Court can only reverse and remand the order at issue in *this proceeding*, not a different order from another Commission proceeding that Denton Electric has not challenged. *See* Tex. Gov't Code § 2001.174(2). Thus, because Denton Electric has already complied with the Final Order and the Court cannot grant the relief requested by Denton Electric, the issue is moot and any ruling on this issue would be an impermissible advisory opinion. *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634 (Tex. 2021) ("The mootness doctrine—a constitutional limitation founded in the separation of powers between the governmental branches—prohibits courts from issuing advisory opinions."). However, even if the issue were not moot, the Commission's rule is a valid exercise of its statutory authority to regulate the wholesale transmission market.

---

[2] Tex. Pub. Util. Comm'n, *Application of Denton Municipal Electric for Interim Update of Wholesale Transmission Rates*, Docket No. 56102, Notice of Approval (Mar. 4, 2024), https://interchange.puc.texas.gov/search/documents/?controlNumber=56102&itemNumber=15.

Agency rules are presumed to be valid. *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 568. The party challenging the agency rule has the burden to demonstrate that "the rule's provisions are not 'in harmony with the general objectives of the act involved.'" *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017) (quoting *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 750 (Tex. 1995)). Courts discern the general objectives "from the plain text of the statutes that grant or limit the agency's authority." *Id*. "Generally then, the objecting party must show that the rule: (1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *Id*.

In any event, the Commission had the authority to require the interim filing. Under PURA Chapter 35 the Commission has authority to regulate the transmission rates for all electric utilities—investor-owned and municipally owned—within the ERCOT system. Tex. Util. Code ch. 35; *supra* pp. 3-5. Chapter 35 of PURA expressly imposes five mandatory duties on the Commission: (1) ensuring that an electric utility provides non-discriminatory access to its transmission facilities; (2) ensuring that a utility recovers its reasonable costs in providing transmission services from the entity receiving the service; (3) pricing wholesale transmission services using the postage stamp methodology; (4) ensuring that ancillary services are

available at reasonable prices and on terms and conditions that are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive; and (5) adopting rules relating to transmission service, rates, and access. *Tex. Mun. Power Agency*, 253 S.W.3d at 193. In addition to these powers expressly conferred upon it, the Commission also has those powers reasonably necessary to carry out its duties. *Id*. at 192-93 (quoting *City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d at 315); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 216 (Tex. 2002) (citing *State of Texas v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 194 (Tex. 1994)).

In accordance with its duty to adopt rules relating to transmission service, rates, and access, the Commission adopted Rule 25.247, which establishes the Commission's rate review schedule that requires utilities to periodically file rate applications. 16 Tex. Admin. Code § 25.247(d)(1). The rule expressly states that the rate review schedule does not limit the Commission's authority to initiate a rate proceeding on any criteria that the Commission determines are in the public interest. *Id*. § 25.247(d)(2). The Commission properly adopted this rule on November 8, 2018, after providing notice and opportunity to comment.[3] Significantly, no comments challenged the Commission's authority to adopt the rule. In fact, the

---

[3] Tex. Pub. Util. Comm'n, *Rulemaking Proceeding to Amend 16 TAC 25.247 to Establish a Filing Schedule for Non-Investor-Owned Transmission Service Providers Operating Within ERCOT*, Project No. 48377, Order Adopting Amendment to §25.247 (Nov. 9, 2018), https://interchange.puc.texas.gov/search/documents/?controlNumber=48377&itemNumber=22.

comments acknowledged that the Commission *does* have the authority to initiate a rate proceeding.[4] Thus, the Commission's authority to initiate a rate proceeding is firmly based on its statutory authority to set wholesale transmission rates, Tex. Util. Code § 35.004(c)-(d), to ensure that rates are just and reasonable; *id.*; *see also id.* § 11.002(a), and to establish rules governing wholesale transmission rates, *id.* § 35.006(a).

The Commission also adopted Rule 25.73, which requires every transmission provider to file an annual earnings report with the Commission providing data on its transmission costs and revenues. 16 Tex. Admin. Code § 25.73(b). This allows the Commission to monitor transmission providers' costs and revenues to determine whether their rates continue to be just and reasonable. *Id*. These annual earnings reports would be utterly meaningless under Denton Electric's theory that the Commission can determine that a utility is over-recovering on its transmission rates but lacks the authority to order that utility to revise its rates.

But Denton Electric argues that Rule 25.247 has no statutory basis because Chapter 35 does not explicitly state that the Commission can order a municipally owned utility to file a transmission rate application. Denton Electric argues that this omission was intentional because the Legislature expressly granted the authority for setting retail rates (under PURA Chapter 36) but not for transmission rates. Cross-

---

[4] *Id*. at 5.

Appellant Br. 65-66. However, Denton Electric mischaracterizes Chapter 36's analogous provision by failing to cite fully to Section 36.157(e). Section 36.157 establishes the rate review schedule for investor-owned utilities, and subpart (e) in full reads "[t]his section *does not limit* the ability of a regulatory authority to initiate a base rate proceeding at any time under this *title*." Tex. Util. Code § 36.157(e) (emphasis added). Thus, this is not an express *grant* of authority with regard to investor-owned utilities as Denton Electric asserts, but a statement that the Commission's authority under *PURA* is not limited by the rate review schedule in Section 36.157. Therefore, this section says the opposite of what Denton Electric asserts, and the Legislature in Section 36.157(e) acknowledged that the Commission has the power to initiate rate proceedings *at any time* under PURA.

The authority to initiate a rate proceeding is logical and consistent with the plain language of the statute. Were the Commission not authorized to require utilities to file interim transmission-cost applications, it would have no ability to carry out its statutory duties to ensure that transmission rates are just and reasonable other than to wait for an overcharging utility to voluntarily file an application to reduce its rates. This problem would plague other provisions in Chapter 35 too, including the requirement that a utility must provide non-discriminatory access to its transmission system. Tex. Util. Code § 35.004(b). This reading would frustrate the efficient and effective regulation of the wholesale transmission market. The Commission has the

31

express duties to set wholesale transmission rates and to ensure that utilities recover their reasonable and necessary costs of providing transmission service. Therefore, necessarily implied by its explicit duties under Chapter 35 is the Commission's authority to require utilities to file an interim transmission rate application to review their rates. *City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d at 316 ("[W]hen the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties."). Thus, Commission Rule 25.247 is consistent with the plain language of Chapter 35 and in harmony with the general objectives of the statute. Denton Electric has failed to show otherwise.

Indeed, after suspecting Denton Electric was over-recovering on its transmission rates, the Commission had the authority to order Denton Electric to file this comprehensive rate application to review its rates. Denton Electric complied with the Commission's order and tacitly admitted that its transmission rates were inconsistent with its current operating costs by requesting to reduce its annual transmission revenue requirement by one-third, or $22.5 million. If the Commission did not have this authority, then Denton Electric would *still* be receiving its vastly inflated rates and would still be permitted to add transmission investment through interim rate proceedings that continually increased the rates it charged to all ERCOT ratepayers. The Commission would be powerless to bring Denton Electric in to

32

review the reasonableness of its rates, and instead would have to wait for Denton Electric to voluntarily file a comprehensive rate application knowing it would give up tens of millions of dollars in its transmission revenue requirement. This is hardly an efficient or effective way to regulate the wholesale transmission market, or to protect the ratepayers in ERCOT. In enacting PURA, the Legislature did not intend for the Commission to be powerless to protect ratepayers.

Exercising its authority under Rule 25.247, the Commission ordered Denton Electric to file an interim transmission rate application. RR, AR Item 159 at 9. Denton Electric filed its application in 2021 based on a test year of 2020, but the Commission did not issue the Final Order until 2023. Denton Electric prolonged the processing of its application by over a year because it failed to comply with the requirements of the rate filing package and submit all required data. Commission staff recommended that Denton Electric file an interim transmission rate application because it was in the public interest to ensure that Denton Electric's rates are set with up-to-date data. RR, AR Item 153 at 18. The ALJs concluded in the proposal for decision that the information provided by Denton Electric in its application may no longer be a fully reliable representation of its current operating costs because of the significant delays in processing the application. RR, AR Item 146 at 40. The Commission adopted the proposal for decision and concluded that it was in the

public interest to require Denton Electric to file an interim transmission rate application. RR, AR Item 159 at 9; *see* 16 Tex. Admin. Code § 25.247.

Therefore, it was in the Commission's authority and supported by substantial evidence for the Commission to order Denton Electric to file an interim transmission rate application, and the Court should affirm the district court's order affirming this provision in the Commission's Final Order.

## PRAYER

For the foregoing reasons, the district court correctly affirmed the provisions in the Commission's Final Order excluding the 6% return on investment fund transfer from Denton Electric's transmission revenue requirement and requiring Denton Electric to file an interim transmission cost of service application. The Commission respectfully requests that the Court affirm the district court's order to the extent it affirmed the Commission's Final Order.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

34

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Jordan Pratt*
JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Phone: (512) 463-2012
Fax: (512) 320-0911

**Attorneys for Appellant Public Utility Commission of Texas**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, I certify that this brief contains 8013 words, as calculated by Microsoft Word, the computer program used to create this document.

/s/ Jordan Pratt
JORDAN PRATT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on July 14, 2025.

Jose E. de la Fuente
jdelafuente@lglawfirm.com
Gabrielle C. Smith
gsmith@lglawfirm.com
Jamie L. Mauldin
jmauldin@lglawfirm.com
Roslyn M. Warner
rwarner@lglawfirm.com
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone: (512) 322-5800
Facsimile: (512) 472-0532

*Attorneys for Appellee*
*City of Denton, operating as Denton Municipal Electric*

Sharbel A. Sfeir
sharbel.sfeir@opuc.texas.gov
Michael Martinez
Michael.martinez@opuc.texas.gov
Justin Swearingen
justin.swearingen@opuc.texas.gov
Chris Ekoh
chris.ekoh@opuc.texas.gov
OFFICE OF PUBLIC UTILITY COUNSEL
1701 N. Congress Avenue, Suite 9-180
P.O. Box 12397
Austin, Texas 78711-2397
Telephone: (512) 936-7500
Facsimile: (512) 936-7525

*Attorneys for Intervenor*
*Office of Public Utility Counsel*

Katherine L. Coleman
kcoleman@omm.com
Michael A. McMillin
mmcmillin@omm.com
John R. Hubbard
jhubbard@omm.com
O'MELVENY & MYERS LLP
303 Colorado St., Suite 2750
Austin, Texas 78701
Telephone: (737) 261-8600

*Attorneys for Intervenor*
*Texas Industrial Energy Consumers*

*/s/ Jordan Pratt*
JORDAN PRATT

37

**INDEX TO APPENDICES**

**App. 1**    Tex. Pub. Util. Comm'n, *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, Docket No. 52715 (Oct. 12, 2023) (Final Order) (AR 159)

**App. 2**    Proposal for Decision, Docket No. 52715, Tex. Pub. Util. Comm'n (Aug. 8, 2023) (AR 146)

**App. 3**    Direct Testimony of Ruth Stark, Project No. 52715, Tex. Pub. Util. Comm'n (Mar. 31, 2023) (AR 113)

**App. 4**    Tex. Util. Code § 35.004

**App. 5**    16 Tex. Admin. Code § 25.192

# Appendix 1

Tex. Pub. Util. Comm'n, *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, Docket No. 52715 (Oct. 12, 2023) (Final Order) (AR 159)



Control Number: 52715



Item Number: 194

| APPLICATION OF DENTON | § | PUBLIC UTILITY COMMISSION |
| MUNICIPAL ELECTRIC TO CHANGE | § | |
| RATES FOR WHOLESALE | § | OF TEXAS |
| TRANSMISSION SERVICE | § | |

## ORDER

This Order addresses the application of Denton Municipal Electric (Denton) to change its transmission cost of service (TCOS) and wholesale transmission rates in the Electric Reliability Council of Texas (ERCOT) region. On August 8, 2023, the State Office of Administrative Hearings (SOAH) administrative law judges (ALJs) filed a proposal for decision (PFD) recommending that the Commission approve Denton's TCOS, with adjustments, and approve Denton's annual wholesale transmission rate, ERCOT export rates, and rate-case expenses.

The Commission adopts the proposal for decision, including findings of fact and conclusions of law, to the extent provided in this Order.

A new finding of fact is added after finding of fact 42 and a new finding of fact is added after finding of fact 46 to support the Commission's conclusions on the reasonableness of the general fund transfers. Findings of fact 43, 47, and 48 are modified for clarity. Finding of fact 44 is deleted because its contents are duplicative of information elsewhere in the order.

New findings of fact are added after finding of fact 48, finding of fact 49 is modified, and new findings of fact are added after finding of fact 58 to reflect the Commission-approved TCOS and to reflect the rate schedules produced by Commission Staff's number run. Findings of fact 60 and 61 are modified to make findings of fact rather than conclusions of law. A new finding of fact is added after finding of fact 61 to state the effective date of the rates approved by this Order.

Conclusion of law 1 is modified for accuracy. A new conclusion of law is added after conclusion of law 11 to reflect the Commission-approved rate of return. Conclusion of law 14 is modified for clarity. New conclusions of law are added after conclusion of law 16 to reflect the Commission-approved TCOS and to reflect the rate schedules produced by Commission Staff's number run. Conclusion of law 17 is modified and a new conclusion of law is added before it to

194

support the Commission's order that Denton file an interim TCOS proceeding within 90 days after this Order is filed. Conclusions of law 7, 8, 9, 12, 13, and 15 are modified to apply law to the facts of this case.

## I. Findings of Fact

The Commission adopts the following findings of fact.

### *Applicant*

1. Denton Municipal Electric (Denton) is a municipally owned electric utility owned and operated by the City of Denton (City) under certificate of convenience and necessity number 30046.

2. Denton owns and operates for compensation in Texas facilities and equipment to transmit and distribute electricity in the Electric Reliability Council of Texas (ERCOT) region.

### *Application; Amended Application*

3. On November 1, 2021, Denton filed an application with the Commission to change its transmission cost of service (TCOS) and wholesale transmission service rates.

4. On December 12, 2021, Denton filed an amendment and supplement to its application.

5. Denton's application is based on a test year ending September 30, 2020.

6. In Commission Order No. 4 filed on January 31, 2022, the Commission ALJ found that Denton was not required to submit a depreciation study as part of the Commission's rate-filing package for non-investor-owned transmission service providers.

7. Commission Staff and the Office of Public Utility Counsel (OPUC) filed an appeal of Order No. 4 on March 4, 2022.

8. On May 12, 2022, the Commission issued an Order on Appeal of Order No. 4 granting the appeal and ordering Denton to amend its application to include a depreciation study.

9. On December 1, 2022, Denton filed an amended application to change its TCOS and wholesale transmission service rates, which included additional testimony and a depreciation study.

10. In the amended application, Denton asked the Commission to approve an annual TCOS of $38,446,435, a transmission rate base of $194,443,862, and an annual wholesale transmission rate of $0.541980 per kilowatt (kW).

11. In the amended application, Denton requested a rate of return of 11.99% calculated using a debt service coverage (DSC) ratio of 1.75x.

12. The amended application includes an 11% general fund transfer (GFT) consisting of a franchise fee component (franchise fee GFT) and a 6% return on investment component (ROI GFT) in schedule E-2, taxes other than income taxes.

13. Denton asked to recover its reasonable and necessary rate-case expenses from its wholesale transmission service customers through a surcharge over a six-month period.

14. In State Office of Administrative Hearings (SOAH) Order No. 14 filed on May 23, 2023, the SOAH ALJs found the application administratively complete.

### *Notice*

15. On November 5, 2021, Denton filed the affidavit of Lambeth Townsend, then-authorized legal representative for Denton, attesting that notice of the application was provided by first class mail on November 1, 2021, to the distribution service providers in Docket No. 51612,[1] all parties in the last complete review of Denton's transmission cost of service, Docket No. 30358,[2] and the OPUC.

16. In Commission Order No. 2 filed on November 23, 2021, the Commission ALJ found the notice sufficient.

### *Intervenors*

17. In Commission Order No. 2 filed on November 23, 2021, the Commission ALJ granted intervenor status to OPUC.

---

[1] *Commission Staff's Petition to Set 2021 Wholesale Transmission Service Charges for the Electric Reliability Council of Texas, Inc.*, Docket No. 51612, Order (May 24, 2021).

[2] *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, Docket No. 30358, Order (Jun. 16, 2005).

18. In Commission Order No. 7 filed on May 5, 2022, the Commission ALJ granted intervenor status to Texas Industrial Energy Consumers (TIEC).

### *Referral to SOAH for Hearing*

19. On May 27, 2022, Commission Staff, OPUC, and TIEC requested that this case be referred to the SOAH.

20. On August 3, 2022, the Commission referred this case to SOAH for assignment of an ALJ to conduct a hearing.

21. On August 4, 2022, the Commission issued a preliminary order identifying 34 issues to be addressed in this proceeding.

22. On December 20, 2022, the SOAH ALJs convened a hearing on interim rates. Denton offered seven exhibits, which were admitted, and Commission Staff offered three exhibits, which were admitted.

23. On December 20, 2022, in Cause No. D-1-GN-22-006855 of the 200th Judicial District of Travis County, Texas, the court issued a temporary injunction enjoining the implementation of interim rates in this proceeding.

24. In SOAH Order No. 11 filed on January 18, 2023, the SOAH ALJs adopted a procedural schedule.

25. On May 11, 2023, SOAH ALJs Daniel Wiseman and Linda Brite convened a hearing on the merits via videoconference. The hearing on the merits concluded the same day.

26. The following parties appeared through legal counsel and participated in the hearing on the merits: Denton, Commission Staff, OPUC, and TIEC.

27. At the hearing on the merits, the SOAH ALJs admitted 19 exhibits offered by Denton, ten exhibits offered by Commission Staff, three exhibits offered by TIEC, and 11 exhibits offered by OPUC.

28. The parties filed post-hearing initial briefs on May 26, 2023, and reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs on June 9, 2023.

29. The record closed on June 9, 2023, except that it was reopened for the limited purpose of admitting exhibits related to Denton's updated rate-case expenses incurred in this docket though June 30, 2023.

## *Evidentiary Record*

30. On November 1, 2021, Denton filed the initial application, the schedules and workpapers under the non-investor owned utility TCOS rate-filing package, and the direct testimonies of Antonio Puente, Jr., Terrance P. Naulty, and Jill A. Schuepbach.

31. On December 12, 2021, Denton filed the first supplemental direct testimonies of Mr. Puente and Ms. Schuepbach.

32. On December 1, 2022, Denton filed the direct testimony of Laurie Tomczyk, and the second supplemental direct testimonies of Mr. Puente and Ms. Schuepbach.

33. On March 3, 2023, OPUC filed the direct testimony of Mark Garrett.

34. On March 31, 2023, Commission Staff filed the direct testimonies of Mark Filarowicz and Ruth Stark.

35. On April 10, 2023, Commission Staff filed the direct testimony Ethan N. Blanchard.

## *Rebuttal Case*

36. On April 24, 2023, Denton filed its rebuttal case, consisting of the rebuttal testimonies of Mr. Puente and Ms. Schuepbach.

37. In its rebuttal case, Denton accepted certain recommendations by OPUC and Commission Staff related to plant held for future use and made specific corrections to Denton's expenses and revenues, leaving only three issues in dispute: (1) whether and to what extent Denton should recover its GFTs; (2) the appropriate debt service coverage (DSC) and rate of return; and (3) whether Denton should be required to offset its TCOS with export revenues.

38. Denton's rebuttal case asked the Commission to approve an annual TCOS of $35,030,428, a transmission rate base of $192,251,567, and an annual wholesale transmission rate of $0.49382 per kW.

39. Denton's rebuttal revenue requirement included $89,347 for taxes other than income - labor and $4,095,558 for operations and maintenance expense allocated to transmission.

40.   Denton's rebuttal rate base included $827,846 for materials and supplies allocated to transmission, $523,113 in cash working capital allocated to transmission, and $3,792,668 in net general plant allocated to transmission.

41.   Denton's rebuttal case asked for a rate of return of 10.19%.

### *General Fund Transfers*

42.   A trade-off for the benefits to the citizens of the City for local ownership and control of their own electric utility (i.e. control over issues like rate-setting and quality of service) is that the City does not collect all the other fees and taxes from its municipally owned utility that it would from utilities that were not owned by the City.

42A.  The City requires other non-municipally owned utilities to pay a franchise fee similar to the franchise fee portion of the GFT.

43.   Requiring a utility to substantiate all its transfers to the general fund that are included in transmission rates falls within the Commission's discretion to ascertain the reasonableness of such costs.

44.   DELETED.

45.   The City raised the ROI portion of the GFT for its electric utility to 6% of gross revenues while maintaining the previous 3.5% ROI for its water and wastewater utilities. The stated purpose of raising the rate (which was purported to be a temporary increase) was because of COVID-19.

46.   The City provided no explanation or justification for reasonableness of the increased 6% ROI rate for its electric utility when its water and wastewater utilities pay a 3.5% ROI, or why the 6% electric ROI was made permanent when it was supposed to be a temporary increase due to COVID-19.

46A.  Denton's transmission costs of service, like all transmission costs, are allocated to ratepayers across ERCOT; by contrast, City's water and wastewater utility expenses are paid by local ratepayers.

47.   Requiring justification for Denton's requested ROI GFT included in transmission rates, as well as justification for a municipality's disparate treatment of its electric utility from its

water and wastewater utilities with respect to its ROI GFT, is not burdensome and within the Commission's authority.

48. Denton has established the reasonableness of the franchise fee component of its general fund transfer but has not sufficiently substantiated the remaining 6% for ROI component's inclusion in transmission rates.

### *Post-Test-Year Adjustments to Rate Base*

48A Denton's rebuttal case requested $223,195,137 in original cost of transmission plant in service, including a post-test-year adjustment of $25,502,626 in additional transmission plant installed from October 1, 2020 through June 30, 2021.

48B. Denton's rebuttal case requested an accumulated depreciation of $36,087,186 in electric transmission plant, including a post-test-year adjustment of $3,923,648 in accumulated depreciation of electric transmission plant installed from October 1, 2020 through June 30, 2021.

48C. Denton's rebuttal case requested an accumulated depreciation of $7,316,963 in general plant allocated to transmission functions, including a post-test-year adjustment for accumulated depreciation of general plant installed from October 1, 2020 through June 30, 2021.

48D. The post-test-year adjustment to invested capital reflects known and measurable changes to historical test-year data.

### *Cash Working Capital*

48E. Denton's reasonable and necessary ERCOT transmission cash working capital is $523,113.

### *Total Rate Base*

48F. Denton's investments are reasonable and necessary and used and useful to the public.

48G. Denton's total ERCOT transmission rate-base is $192,251,567.

### *Other Revenues — Export Revenue*

49. Denton's TCOS should be offset by the amount of export revenues it should have collected during the test year, which is $16,313.

*Debt Service Coverage and Rate of Return*

50. The instructions in the rate filing package, both before and after modification, provide that the Commission only resorts to consideration of the board of director's policy in lieu of DSC requirements stated in the transmission service provider's (TSP) bond resolutions.

51. The stated DSC ratio in Denton's most recent debt issuance is 1.25x.

52. At the time of Denton's initial application, the rate filing package provided that the DSC levels stated in the TSP's most recently issued bond covenants plus additional coverage of 0.25 for municipal utilities shall be presumed reasonable.

53. The rate filing package is not law.

54. The Commission's October 6, 2022 modification of the rate filing package removed a rebuttable presumption, which is a procedural change that does not affect a vested substantive right.

55. The modified rate filing package provides that an applicant may request an additional 0.25x to the DSC ratio if the applicant shows that it has utilized short-term debt financing as an alternative to long-term debt financing in a cost-effective manner.

56. Denton's amended application was filed on December 1, 2022, after the rate filing package was modified.

57. No evidence was presented showing that Denton utilized short-term debt financing as an alternative to long-term debt financing.

58. The 1.25x DSC ratio set forth in Denton's most recent debt issuance should be adopted and applied to Denton's rebuttal case, which results in a rate of return of 6.21%.

58A. Denton's return on transmission rate base is $11,930,303.

*Expenses*

58B. Denton's reasonable and necessary total operating expenses for ERCOT transmission are $13,548,937.

58C. Denton's reasonable and necessary operation and maintenance expenses for ERCOT transmission are $4,095,558.

58D.   Denton's reasonable and necessary administrative and general expenses for ERCOT transmission are $2,179,505.

58E.   Denton's reasonable and necessary depreciation expenses for ERCOT transmission are $7,786,085.

58F.   Denton's total operating expenses are reasonable and necessary to provide service to the public.

### TCOS and Wholesale Transmission Rate

58G.   The annual transmission revenue requirement that will allow Denton a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses is $25,479,240, which results in a TCOS of $25,462,927 after deductions.

58H.   Denton's annual wholesale transmission rate is $$0.35895 per kW per year. based on the average four-coincident peak demand in ERCOT for 2020.

58I.   Denton's TCOS and wholesale transmission rates are just and reasonable.

### ERCOT Export Rate

58J.   Denton's hourly rate for power to be exported from ERCOT is $0.000041 per kW.

### Interim TCOS Filing and Rate-Case Expenses

59.   Given the particular circumstances of this docket, it is in the public interest to require Denton to file an interim TCOS proceeding within 90 days of the final order in this docket.

60.   Denton's proposed rate-case expenses of $738,327.89 incurred from October 1, 2021 through June 30, 2023 are reasonable, as attested to by the affidavit of attorney Jamie L. Mauldin filed on July 21, 2023.

61.   It is appropriate that Denton should recover its rate-case expenses incurred in this docket through a separate surcharge of $$0.001604 per kW per month of coincidental peak demand, determined in accordance with 16 TAC § 25.192, over a six-month period.

### Effective Date

61A.   The effective date of Denton's wholesale transmission rate is the date of this Order.

## II. Conclusions of Law

The Commission adopts the following conclusions of law.

1. The Commission has authority over this proceeding under PURA §§ 35.004, 35.006, and 40.004(1).

2. Denton is a municipally owned utility as defined in PURA § 11.003(11) and an electric utility as defined in PURA § 35.001 for the purpose of wholesale transmission service.

3. Denton is a TSP as defined in 16 Texas Administrative Code (TAC) § 25.5(141) that provides transmission service as defined in PURA § 31.002(20).

4. The Commission processed the application in accordance with the requirements of PURA, the Administrative Procedure Act,[3] and Commission rules.

5. Denton provided notice of the application in compliance with 16 TAC § 22.55.

6. Denton's application complies with the requirements of 16 TAC § 25.192.

7. Under PURA § 35.004(c) the Commission must ensure that Denton recovers its reasonable costs in providing wholesale transmission service.

8. As a TSP in the ERCOT region, Denton may seek authority to change its transmission rates under 16 TAC § 25.192(g).

9. The return may be determined based on Denton's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the Commission will consider the coverage ratios required in Denton's bond indentures or ordinances and the most recent rate action of the rate setting authority for Denton under 16 TAC § 25.192(c)(3).

10. The Commission's modifications to the rate filing package were not a significant change which would invoke the requirements of 16 TAC § 22.80.

11. Laws may not operate retroactively to deprive or impair vested substantive rights acquired under existing laws, or create new obligations, impose new duties, or adopt new disabilities in respect to transactions or considerations past; however, no litigant has a vested right in

---

[3] Tex. Gov't Code §§ 2001.001–.903.

a statute or rule which affects remedy or is procedural in nature and which affects no vested substantive right. Changes in such statutes or rules are considered remedial in nature and have been held not to violate the provisions of Article 1, sec. 16 of the Constitution. *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981) (citing *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 525 (Tex. 1975); *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 649 (Tex. 1971); *Deacon v. City of Euless*, 405 S.W.2d 59, 62 (Tex. 1966).

11A. A DSC ratio of 1.25x for Denton is reasonable under 16 TAC § 25.192(c)(3) for calculating Denton's return on transmission rate base.

12. Texas Government Code § 1502.059 grants the City the authority to make transfers to its general fund from its municipally owned utilities but does not require such transfer to be included in the rates of those utilities.

13. Texas Government Code § 1502.057 explicitly identifies which expenses must be included in Denton's rates and does not include general fund transfers as items that must be included.

14. PURA does not specify any required treatment in wholesale transmission rates of transfers to the City's general fund from its municipally owned utilities' funds.

15. Under 16 TAC § 25.192(e), Denton is required to charge exporting entities for the use of the ERCOT transmission system in exporting power from ERCOT. Subsection (f) of that rule specifies that such revenue must be credited to all transmission customers.

16. Denton did not collect export charges as required by 16 TAC § 25.192.

16A. Denton's post-test-year adjustments to expenses reflect known and measurable changes to historical test-year data under 16 TAC § 25.231(b), (c)(2)(F)(i).

16B. Denton's annual TCOS revenue requirement in the amount of $25,462,927 is reasonable and necessary and calculated in accordance with 16 TAC § 25.192(c).

16C. Denton's transmission-related investment is reasonable and necessary and is used and useful, consistent with the requirements of 16 TAC § 25.192(c).

16D. Denton's annual wholesale transmission rate of $0.35895 per kW per year is properly calculated under 16 TAC § 25.192.

16E. The wholesale transmission rate base additions since Denton's last full TCOS proceeding in Docket No. 30358 have been reconciled in accordance with 16 TAC § 25.192 and were prudently incurred.

16F. Denton's ERCOT export rates approved by this Order comply with 16 TAC § 25.192(e).

16G. The Commission's authority to initiate a rate proceeding for Denton under 16 TAC 25.247 is within the Commission's authority under PURA § 35.004(c) to ensure that a TSP recovers its reasonable costs in providing wholesale transmission service necessary for the transaction.

17. Nothing in 16 TAC 24.247 limits the Commission's authority to initiate a rate proceeding for Denton at any time under Title 16 of the Texas Administrative Code on the basis of other criteria that the Commission determines are in the public interest, including but not limited to the information provided in a non-investor-owned transmission service provider's earnings monitoring report.

18. Denton may recover its reasonable rate-case expenses under PURA § 35.004(c).

### III. Ordering Paragraph

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders.

1. The Commission adopts the proposal for decision, including findings of fact and conclusions of law, to the extent provided in this Order.

2. The Commission approves Denton's TCOS and wholesale transmission rates to the extent provided by this Order.

3. The Commission establishes Denton's annual TCOS revenue requirement as $25,462,927, effective the date of this Order.

4. The Commission establishes Denton's wholesale transmission rate as $0.35895 per kW per year, effective the date of this Order.

5. The Commission establishes Denton's export rates as described in finding of fact number 58J, effective the date of this Order.

6.     Denton must recover $738,327.89 for rate-case expenses incurred from October 1, 2021 through June 30, 2023 in this proceeding through a separate surcharge of $0.001604 per kW per month of coincidental peak demand, determined in accordance with 16 TAC § 25.192, over a six-month period.

7.     Denton must file a report documenting the calculation and collection of the monthly rate-case expense surcharge from customers in compliance with this Order. The filing must be made in a separate docket, *Compliance Filing for Docket No. 52715 (Application of Denton Municipal Electric to Change Wholesale Transmission Service Rates)*, Docket No. 55644.

8.     Denton must file an interim TCOS proceeding no later than 90 days after this Order is filed.

9.     Within ten days of the date this Order is filed, Denton must provide the Commission with a clean copy of the approved wholesale transmission service tariff to be stamped *Approved* and retained by Central Records.

10.    The Commission denies all other motions and any other requests for general or specific relief, if not expressly granted.

Signed at Austin, Texas the 12th day of October 2023.

PUBLIC UTILITY COMMISSION OF TEXAS

KATHLEEN JACKSON, INTERIM CHAIR

WILL MCADAMS, COMMISSIONER

LORI COBOS, COMMISSIONER

JIMMY GLOTFELTY, COMMISSIONER

# Appendix 2

Proposal for Decision
Docket No. 52715, Tex. Pub. Util. Comm'n
(Aug. 8, 2023) (AR 146)



# Filing Receipt

**Filing Date - 2023-08-08 01:26:26 PM**

**Control Number - 52715**

**Item Number - 180**

# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

August 8, 2023

Stephen Journeay, Commission Counsel      <u>**VIA EFILE TEXAS**</u>
Commission Advising and Docketing Management
William B. Travis State Office Building
1701 N. Congress, 7th Floor
Austin, Texas 78701

> **RE: Docket Number 473-22-07688; PUC Docket No. 52715;** *Application of the Denton Municipal District to Change Rates for Wholesale Transmission Service*

Dear Mr. Journeay:

Please find attached a Proposal for Decision (PFD) in this case. By copy of this letter, the parties to this proceeding are being served with the PFD.

Please place this case on an open meeting agenda for the Commissioners' consideration. Please notify the Administrative Law Judges and the parties of the open meeting date, as well as the deadlines for filing exceptions to the PFD, replies to the exceptions, and requests for oral argument.

CC: Service List

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE
# HEARINGS

---

## APPLICATION OF DENTON MUNICIPAL ELECTRIC TO CHANGE RATES FOR WHOLESALE TRANSMISSION SERVICE

---

## TABLE OF CONTENTS

List of Acronyms and Abbreviations ........................................................................i

I. Notice, Jurisdiction, and Procedural History .....................................................2

II. Discussion ........................................................................................................5

    A.  General Fund Transfers.............................................................................6

        1.  DME's Position ..................................................................................9

        2.  Staff's Position................................................................................ 13

        3.  OPUC's Position ............................................................................ 18

        4.  TIEC's Position ..............................................................................20

        5.  Analysis ..........................................................................................20

    B.  Debt Service Coverage .............................................................................23

        1.  DSC Ratio of Bond Indentures or Ordinances.................................25

        2.  Rate Filing Package Language .........................................................27

      3.   Overearning ............................................................ 30

      4.   Rate of Return ........................................................ 32

      5.   Analysis ................................................................. 33

   C.  Other Revenues (Export Revenue) ................................... 36

   D.  Additional Interim TCOS Filing ....................................... 39

   E.  Rate-Case Expenses ...................................................... 40

III. Conclusion ................................................................... 41

IV. Findings of Fact ............................................................ 42

V. Conclusions of Law ......................................................... 48

VI. Proposed Ordering Paragraphs ........................................... 50

# LIST OF ACRONYMS AND ABBREVIATIONS

| TERM | DEFINITION |
|---|---|
| 4CP | Four Coincident Peak |
| Application | DME's application filed November 1, 2021, as amended |
| ALJ | Administrative Law Judge |
| City | City of Denton |
| Commission | Public Utility Commission of Texas |
| DC | Direct-current |
| DME | Denton Municipal Electric |
| DSC | Debt Service Coverage |
| DSP | Distribution Service Provider |
| ERCOT | Electric Reliability Council of Texas |
| GFT | General Fund Transfer |
| IOU | Investor-Owned Utility |
| MOU | Municipally Owned Utility |
| OPUC | Office of Public Utility Counsel |
| PFD | Proposal for Decision |
| PURA | Public Utility Regulatory Act |
| RCE | Rate-Case Expenses |
| RFP | Rate Filing Package |
| ROI | Return on Investment |
| Rule | 16 Texas Administrative Code section |
| SOAH | State Office of Administrative Hearings |
| Staff | Staff of the Public Utility Commission of Texas |
| TAC | Texas Administrative Code |
| TCOS | Transmission Cost of Service |
| TIEC | Texas Industrial Energy Consumers |
| TSP | Transmission Service Provider |

# Before the
# State Office of Administrative
# Hearings

---

## APPLICATION OF DENTON MUNICIPAL ELECTRIC TO CHANGE RATES FOR WHOLESALE TRANSMISSION SERVICE

---

## Proposal for Decision

Denton Municipal Electric (DME), a municipal electric utility owned by the City of Denton (the City), filed an application (as amended, Application) with the Public Utility Commission of Texas (Commission) to change its transmission cost of service (TCOS) and wholesale transmission rates. DME requests an annual TCOS of $35,030,428 and an annual wholesale transmission rate of $0.49382 per kilowatt. DME also requests to recover its rate-case expenses for this proceeding through a six-month surcharge.

The proposal for decision (PFD) focuses on the following three main issues still in dispute: whether DME's rates should provide for the full recovery of payments (referred to as general fund transfers, or GFTs) made from DME to the City; the appropriate debt service coverage (DSC) ratio; and whether DME's rates should be offset by its export revenues.[1] The PFD also addresses DME's requested rate-case expenses and the necessity for an interim TCOS filing.

For the reasons discussed below, the Administrative Law Judges (ALJs) find that DME's recovery of its GFTs should be limited to the 5% franchise fee portion and that the 6% return on investment (ROI) portion should be excluded from rates; that DME's DSC ratio should be 1.25x and that DME's TCOS should be offset by the amounts it should have collected in export charges. The ALJs also recommend that DME recover its requested rate-case expenses in the amount of $738,327.89 over six months, and that DME be required to file an interim TCOS proceeding within 90 days of the final order in this docket.

## I. NOTICE, JURISDICTION, AND PROCEDURAL HISTORY

The Commission has jurisdiction over the Application under Public Utility Regulatory Act (PURA)[2] §§ 35.004, 35.006, 35.007, and 41.004(1), and 16 Texas Administrative Code § (Rule) 25.192. The State Office of Administrative Hearings

---

[1] Multiple issues were initially in dispute in this proceeding but DME agreed to several adjustments proposed by other parties and therefore all but three issues are now uncontested. The agreed-to adjustments are detailed within DME's Rebuttal Case, as referenced below.

[2] Tex. Util. Code §§ 11.001-66.016.

2

(SOAH) has jurisdiction over all matters relating to the conduct of a hearing in this matter under Texas Government Code § 2003.049 and PURA § 14.053.

In 2020, as part of its annual review of transmission service provider earnings reports, the Commission ordered DME to file a new comprehensive rate case based on a test year ending on September 30, 2020.[3] Pursuant to that order, DME filed its application on November 1, 2021,[4] and its proof of notice on November 5, 2021. On November 22, 2021, Staff filed a recommendation on sufficiency and notice recommending that the application be found insufficient for failure to include audited financial statements and a depreciation study.[5] On November 23, 2021, the Commission ALJ found the notice sufficient but found the application deficient and required DME to file supplemental information and also granted the Office of Public Utility Counsel's (OPUC) motion to intervene.[6]

In Order No. 4, the Commission ALJ found that DME was not required to file a depreciation study.[7] DME filed an amendment and supplement to its application on December 12, 2021. The Commission granted Staff's and OPUC's appeal of

---

[3] *Year-End 2019 Electric Utility Earnings Report in Accordance with 16 TAC § 25.73*, Project No. 50655, Order (Oct. 16, 2020).

[4] DME Ex. 1.

[5] Commission Staff's Recommendation on Sufficiency of the Application (Nov. 22, 2021).

[6] Commission Order No. 2 (Nov. 23, 2021).

[7] Commission Order No. 4 (Jan. 31, 2022).

Order No. 4 on May 12, 2022, and ordered DME to amend its application to include a depreciation study.[8]

On May 5, 2022, Texas Industrial Energy Consumers (TIEC) was granted intervenor status.[9]

The Commission referred this case to SOAH on August 3, 2022.[10] The Commission issued a Preliminary Order on August 4, 2022, identifying 34 issues to be addressed in this proceeding.[11]

At the prehearing conference held on September 14, 2022, a deadline for DME to file a depreciation study was set for December 1, 2023.[12] DME filed its amended application on December 1, 2023, including the required depreciation study.[13] On April 24, 2023, DME filed its rebuttal testimony, which accepted a number of Staff's and OPUC's proposed adjustments (Rebuttal Case). The SOAH ALJs found the Application administratively complete on May 23, 2023.[14]

---

[8] Order on Appeal of Order No. 4 (May 4, 2022).

[9] Commission Order No. 7 (May 5, 2022).

[10] Order of Referral (Aug. 3, 2022).

[11] Preliminary Order (Aug. 4, 2022).

[12] Prehearing Conference Transcript (Tr.) at 5-6 (Sept. 14, 2022).

[13] DME Ex. 14.

[14] SOAH Order No. 14 (May 23, 2023).

4

A hearing on the merits was held on May 11, 2023, by videoconference before SOAH ALJs Linda Brite and Daniel Wiseman. DME, OPUC, TIEC, and Staff participated in the hearing. The parties filed post-hearing initial briefs on May 26, 2023, and reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs on June 9, 2023, upon which the record closed.

After the hearing, DME filed an update to its rate-case expenses incurred in this proceeding. On July 25, 2023, DME filed a motion to admit certain filings related to rate-case expenses as exhibits. No objection was filed. The motion is granted, the evidentiary record is reopened for the limited purpose of admitting the exhibits, and the exhibits are admitted.[15]

## II. DISCUSSION

DME is a municipally owned utility (MOU) providing electric transmission service within the Electric Reliability Council of Texas (ERCOT) region and is a transmission service provider (TSP) as defined in the Commission's rules.[16] This proceeding involves DME's first comprehensive application to change rates for wholesale transmission service in over 16 years. DME's last comprehensive rate case

---

[15] The specific exhibits are: the Affidavit of Jamie L. Mauldin Related to Denton Municipal Electric's Rate Case Expenses with all corresponding attachments, filed on July 21, 2023; and the Supplemental Direct Testimony of Ruth Stark with all corresponding attachments, filed on July 25, 2023. The ALJs designate these exhibits as DME Exhibits 20 and 21, respectively.

[16] 16 Tex. Admin. Code (TAC) § 25.5(141).

was based on a test year ending September 30, 2003.[17] In that case, the Commission approved a 28.05% authorized rate of return.[18] Since that time, DME's rate base has grown by a factor of 16 and its transmission revenues have increased by a factor of 13.[19]

In DME's most recent interim TCOS proceeding the Commission approved a transmission revenue requirement of $59,752,472.[20] As ordered by the Commission, DME submitted the application at issue in this proceeding to change its wholesale transmission service rates, and as evidenced by its Rebuttal Case, DME now requests a reduced transmission revenue requirement of $35,030,428—about $24.7 million less than its current revenue requirement.[21]

The three disputed issues and rate-case expenses are addressed below. The remaining uncontested issues are addressed solely in the findings of fact and conclusions of law.

## A. GENERAL FUND TRANSFERS

Many cities, like Denton, that own electric utilities make annual fund transfers, GFTs, from their municipal utilities into the cities' general funds to be

---

[17] *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, Docket No. 30538, Order (Jun. 16, 2005).

[18] TIEC Ex. 1 at 4 (Oct. 9, 2020).

[19] TIEC Ex. 1 at 4.

[20] DME Ex. 1 at Schedule A.

[21] DME Ex. 14 at Schedule A.

used for general purposes.[22] These types of transfers are referred to by different names based on how the ordinances or policies that create them are designed. The amounts transferred are also calculated in different ways based on the specific purpose of the transfers as outlined in the ordinances or policies that authorize them.[23]

Section 1502.059 of the Texas Government Code provides the authority for MOUs like DME to make transfers to the city's general fund:

> Notwithstanding Section 1502.058(a) [setting limits on a municipality's use of revenue] or a similar law or municipal charter provision, a municipality and its officers and utility trustees may transfer to the municipality's general fund and may use for general or special purposes revenue of any municipally owned utility system in the amount and to the extent authorized in the indenture, deed of trust, or ordinance providing for and securing payment of public securities issued under this chapter or similar law.

Pursuant to this authority, DME pays the City a franchise fee of 5% of its gross revenues (the Franchise Fee GFT) and a return on investment of 6% of its gross revenues (the ROI GFT).[24]

---

[22] Staff Ex. 1 (Stark Direct Testimony (Dir.)) at 8.

[23] Staff Ex. 1 (Stark Dir.) at 8.

[24] DME Ex. 8 (Puente Dir.) at 56.

The Franchise Fee GFT was established in a memo from the City's Finance Department in September 2018, and is applicable to all City utilities.[25] The Franchise Fee GFT is intended to compensate the City for DME's use of public rights-of-way in the same manner any other utility or company operating within the City's rights-of-way would.[26] The Franchise Fee GFT is consistent with the franchise rates charged to other utilities operating within the City.[27] The parties agree that the Franchise Fee GFT is appropriately included in DME's rates.

The second component of DME's GFTs is the 6% ROI GFT. The City's Charter provides that the City is entitled to receive annually no more than 6% of the net investment of excess revenues from its utility systems.[28] Until April 21, 2020, the City's water, wastewater, and electric utilities paid the City an ROI of 3.5%[29]. On that date, the City Council passed an ordinance raising the required ROI payment to 6% for the electric utility only. City of Denton Ordinance No. 20-875 explained that the ROI rate of the electric utility was raised in response to the impacts from COVID-19 and would be effective until September 30, 2022.[30] Although the 6% ROI payment was initially intended to be temporary, a subsequent ordinance adopted by the City formalized the ROI payments paid by City utilities and made permanent the City's

---

[25] DME Ex.8 (Puente Dir.) at 370-71.

[26] DME Ex. 8 at Bates 370; DME Ex. 15 at Bates 13:21-14:2.

[27] Staff Ex. 1 (Stark Dir.) at 12.

[28] DME Ex. 2 (Puente Dir.) at 56, Attachment WP/E-2/1.

[29] The City's Solid Waste utility was excluded from contributing ROI payments.

[30] Staff Ex. 7 (DME's Response to Staff RFI No. 2-4, City of Denton Ordinance No. 20-875).

8

policy of using a 6% ROI from the electric utility. The other utilities' ROI payments remained at 3.5%.[31]

In this proceeding, DME requests to recover $3,810,007 in GFTs, representing 11% of its gross revenues.[32] $1,893,537 of this amount is attributable to the ROI GFT and $1,577,947 is attributable to the Franchise Fee GFT.[33] No party objects to the inclusion of the Franchise Fee GFT in DME's TCOS. However, Staff, OPUC, and TIEC contend that DME should not be allowed to recover the 6% ROI GFT.

### 1. DME's Position

According to DME, the Commission has no authority to limit a MOU's GFTs or to create new standards in this proceeding to dictate how much of a GFT is recoverable in rates, and indeed has never attempted to. DME asserts that any decision adopting the other parties' novel positions prohibiting the full recovery of DME's GFTs would create burdensome requirements and conflict with longstanding Commission practice.

Including GFTs in TCOS rates is a common practice for MOUs across Texas.[34] GFTs serve multiple purposes—the transfer compensates the city for its

---

[31] DME Ex. 14 (Second Supplemental Testimony of Antionio Puente, Jr.), Attachment AP-1.

[32] Amended Application at 255.

[33] DME Ex. 16 at 47.

[34] Staff Ex. 1 (Stark Dir.) at 8.

ownership of the utility and the inherent risks associated with such ownership—it also provides cost recovery to the city of revenue streams it would receive if the utility was investor-owned, such as franchise fees, ad valorem taxes, and dividends.[35]

While the other parties rightly support the recoverability of DME's Franchise Fee GFT, they are incorrect that the 6% ROI is not recoverable, DME argues. DME witness Antonio Puente, Jr. testified that the 6% ROI GFT is specifically provided for in the City's Charter, and is akin to the dividends an investor owned utility (IOU) pays its shareholders, or the capital credits an electric cooperative returns to its member customers.[36] In addition, Mr. Puente testified that "the ROI paid from DME represents a return to the taxpayer for their implied guarantee, in the case of revenue bonds, and explicit guarantee, in the case of general obligation debt in the form of certificates of obligation, that are ultimately guaranteed by the City taxpayers and are utilized to fund transmission capital investments/assets."[37]

MOUs are expressly authorized to make GFTs under Texas Government Code § 1502.059. DME notes that the statute does not provide any limitation on the purpose of the transfer or require that each component of the transfer be specifically justified or tied to a utility's costs. Instead, the amount of the transfer is determined entirely by the city instrument authorizing it, and the statute provides no authority for the Commission to limit a GFT. Although the other parties argue that the statute does not cover the ratemaking implications of a GFT, DME maintains that there is

---

[35] DME Ex. 15 at 13.

[36] DME Ex. 15 (Puente Reb.) at 13.

[37] DME Ex. 15 (Puente Reb.) at 13.

*no* rule or statute that expressly governs GFTs in ratemaking: There is only one section in PURA and a single rule that regulates MOUs' TCOS, and they are both silent on GFTs.[38]

According to DME, PURA § 35.004 is the only statute governing TCOS for MOUs. PURA § 35.004(a) provides:

> An electric utility or transmission and distribution utility that owns or operates transmission facilities shall provide wholesale transmission service at rates and terms, including terms of access, *that are comparable to the rates and terms of the utility's own use of its system.*[39]

Here, because DME is mandated—through the city Charter, an ordinance, and a financial memo—to make a 6% ROI GFT from both the transmission *and* distribution components of its system, it is a required part of the rates and terms of DME's own use of its system. Disallowing the recovery of that 6% ROI would necessarily mean that the comparability standard would not be satisfied.

DME contends PURA § 35.004(c) does not grant authority for the Commission to exclude GFTs. That provision provides that the Commission shall ensure that the utility "recovers the utility's reasonable costs . . . *so that the utility's other customers do not bear the costs of the service.*" This statute therefore acts only to ensure that there is no disparity between customer classes. Under the City's Charter, ordinances, and policies, DME is required to make a collective 11% GFT. Thus,

---

[38] *See* Tex. Util. Code ch. 35; 16 TAC § 25.192.

[39] Tex. Util. Code § 35.004(a) (emphasis added).

11

DME argues that if the Commission prohibits DME from recovering the full amount of that GFT in its transmission rates, that amount must necessarily come from DME's distribution customers, who will be forced to "bear the costs of the service" of providing transmission services.

Likewise, according to DME, applying Rule 25.192(c)(4) is inapplicable here, as that rule applies only in instances where an MOU needs a certificate of convenience and necessity to construct transmission facilities outside its own jurisdiction and where the city in which the facilities are located would receive a payment in lieu of ad valorem taxes—a reading confirmed by Staff witness Ruth Stark.[40]

Crucially, DME argues, the Texas Supreme Court has examined the issue of including GFTs in rates. In *San Antonio Independent School District v. City of San Antonio*,[41] customers of San Antonio's MOU brought an action to exclude a GFT from the MOU's rates. In upholding the GFT, the court interpreted an earlier version of Texas Government Code § 1502.059 to find that the GFT of 14% of gross revenues was reasonable to include in rates. The Court emphasized that the GFT statute does not require a city to furnish its utility services at cost.[42] This is in direct conflict with Staff's contention that a GFT must be related to the actual cost of the provision of service. In addition, the Court found that "the general rule is that the

---

[40] Tr. at 83.

[41] 550 S.W.2d 262 (Tex. 1976).

[42] *Id.* at 264.

city is entitled to make a reasonable profit from its own utility system," just as the City has done here.[43]

## 2. Staff's Position

Staff argues that it is unfair to make all ERCOT ratepayers pay for DME's subsidy to the City to plug holes in its local budget. While it is reasonable to include the Franchise Fee GFT in DME's TCOS because it is justified by a specific rationale related to the provision of service, Staff insists DME has provided no such justification for including the ROI GFT in DME's transmission rates. DME's explanation that it is required by the City Charter, ordinances, and polices, according to Staff, does not in itself show that it is reasonable for all ratepayers in ERCOT to support additional investment return that DME acknowledges is unrelated to the actual cost of providing service.

Staff notes that, in contrast to DME's specific rationale for the Franchise Fee GFT, the City itself has acknowledged that the ROI is unrelated to actual costs of providing transmission services through the following statement:

> The amount transferred to the General Fund for administrative overhead is an operating expense of the Electric System, while amounts transferred as franchise fees and as a return on investment are made after the Electric System has provided for the payment of operating expenses and debt service requirements.[44]

---

[43] *Id.*

[44] Staff Ex. 1 (Stark Dir.), at Attachment RS-5 (*Official Statement Regarding City of Denton, Texas Utility System Revenue Refunding Bonds, Taxable Series 2021* at 20 (Aug. 26 ,2021)).

By not tying the ROI GFT to the actual cost of providing service, Staff argues, DME has failed to demonstrate the reasonableness of such a transfer.[45] Indeed, neither the City nor DME has offered an explanation of why the allegedly temporary ROI GFT increase from 3.5% to 6% was made permanent, or why only the ROI for the City's electric utility was increased while the other City utilities' were not.[46] Instead, DME claims that only the City Council could explain the justification for these actions:

> Neither City officials nor DME are privy to the City Council's justification for the differences in the ROI between the Electric Fund, Water Fund, and Wastewater Fund. The Denton City Council has discretion to determine the ROI of each utility fund as long as the amounts are within the total authorized transfers determined by City Charter and Ordinances.[47]

In the absence of any articulable justification, according to Staff, there is no basis for including the ROI GFT in rates.

Nor, Staff contends, does section 1502.059 of the Texas Government Code require the recovery of GFTs in an MOU's rates. That provision does authorize an MOU to transfer funds to a city's general fund, but it is silent on whether or to what extent those payments are recoverable through rates. Not all legally permitted

---

[45] Staff Ex. 1 (Stark Dir.) at 13.

[46] Staff Ex. 1 (Stark Dir.) at 13.

[47] Staff Ex. 8 (DME's Supplemental Response to Staff RFI 2-4).

expenditures, such as non-qualified pensions or private airplane expenses, must be recovered through rates. And while Texas Government Code § 1502.057 does address the components of an MOU's costs that must be included in rates, GFTs are not one of the required components.[48]

The source of the Commission's authority to review the reasonableness of an MOU's inclusion of GFTs in wholesale transmission rates comes from PURA's requirement that such a utility recover its *reasonable* costs in providing transmission service. Specifically, PURA § 35.004(c) provides:

> When an electric utility,[49] electric cooperative, or transmission and distribution utility provides wholesale transmission service within ERCOT at the request of a third party, the commission shall ensure that the utility recovers the utility's reasonable costs in providing wholesale transmission services necessary for the transaction from the entity for which the transmission is provided so that the utility's other customers do not bear the costs of the service.

Staff asserts that DME erroneously claims that this subsection of PURA serves only to ensure that there is no disparity between customer classes, so that DME can recover all of its costs attributable to transmission service and DME's distribution customers do not subsidize transmission services by making up the shortfall. Rather, Staff argues, this subsection means that DME must treat all of its *transmission* customers equally. And the statute is clear on the Commission's authority to determine the reasonableness of costs included in wholesale

---

[48] Tr. at 89.

[49] "Electric utility" is defined to include an MOU in this statute. PURA § 35.001.

transmission rates, Staff contends, and prohibiting the Commission from disallowing a portion of the GFTs (or any other expense) that it finds unreasonable would render the Commission's ratemaking authority virtually meaningless.

While DME is correct, according to Staff, that the Commission has never limited an MOU's GFT in a TCOS proceeding, those cases were either uncontested or involved the MOU agreeing to a reduced GFT amount. Staff does not argue that GFTs should be categorically excluded from DME's rates and does not oppose the inclusion of the Franchise Fee GFT. Unlike the Franchise Fee GFT, however, Staff argues DME has not provided evidence of the reasonableness of the ROI GFT. Whereas DME demonstrated that the Franchise Fee GFT is comparable to what other utilities operating within the City paid for their franchise fees, DME provided no such information related to either the dollar amount of ad valorem taxes or other taxes and fees paid by other utilities to the City that would support a contention that the 6% ROI GFT is in any way comparable to those utilities' expenses. Thus, there is no proof that the ROI GFT, as DME argues, accounts for costs DME would have to pay but for the fact that it is a business unit of the City.[50]

According to Staff, DME's reliance on a 1976 case, *San Antonio Independent School District v. City of San Antonio*, is misplaced. Even setting aside the fact that PURA § 35.004(c)—which authorizes the Commission to review the reasonableness of wholesale transmission rates—was enacted after this ruling, the facts of that case are starkly different. Importantly, the court noted that "[p]etitioners make no

---

[50] DME Initial Br. at 7.

complaint about the reasonableness of the rates or of City's return from its gas and electric systems,"[51] and "[u]pon proper pleading and record, if the City's return were proved to be excessive and unreasonable, the courts could grant relief."[52] Staff points out that the reasonableness of DME's rates *is* at issue here, and there is nothing in that case that prohibits the Commission from excluding unreasonable expenses, like the ROI GFT, from DME's wholesale transmission rates.

DME argues that it is being treated unfairly and differently from other non-MOU utilities, but Staff notes that there is no requirement for there to be comparable treatment of DME and other non-MOU utilities. And, as an MOU, DME is different. DME's fairness arguments fail to acknowledge that there is a trade-off between the benefits of local ownership and control for the City's residents having their own electric utility and the fact that the City does not collect all the other fees and taxes that it would if the utility was not municipally owned. Cities that do not have MOUs cannot arbitrarily order a transfer from a utility in order to shore up their budgets. While the City *can* "use its electric utility as a rainy-day fund," this does not mean that all ERCOT ratepayers should pay for the City's budget shortfalls.[53]

---

[51] 550 S.W.2d at 264.

[52] *Id.* at 265.

[53] Staff Reply Br. at 8.

### 3.    OPUC's Position

Like Staff, OPUC argues that DME should recover only the Franchise Fee GFT and that the 6% ROI GFT should be excluded from rates. According to OPUC, an 11% payment to the City is unreasonable compared to the minimum franchise fee taxes of 4% that municipalities would receive from an IOU. OPUC Witness Mark Garrett testified that the ROI GFT amount should "be reduced closer to the level that would be appropriate if the utility were owned by investors."[54] According to Mr. Garett, limiting DME's recoverable GFT to 5% percent of gross revenue would reduce the revenue requirement by $2,454,914.[55]

OPUC disputes DME witness Puente's testimony that: (1) the ROI GFTs are no different than an electric cooperative's capital credits or an IOU's dividend payments, (2) that the GFTs are payments in exchange for the City's implied or explicit guarantee of the bonds to support transmission investments, and (3) that the ROI GFT is not additional compensation for DME but a payment for the use of rights-of-way that other utilities would have to pay the City.

With respect to the first point, OPUC asserts that the GFTs are different from an IOU's dividends or an electric cooperative's capital credits, because those items are paid *out of* the utility's return on investment recoveries so that there are no additional payments to investors *on top of* the return calculations included in rates for

---

[54] OPUC Ex. 1 (Garrett Dir.) at 9.

[55] OPUC Ex. 1 (Garrett Dir.) at 10.

cooperatives and IOUs. Here, DME seeks to recover its return on investment *and* an additional payment, as well.

OPUC further argues that the Commission should apply Rule 25.192(c)(4) to the GFTs in this case. That rule provides:

> A municipally owned utility that is required to apply for a certificate of public convenience and necessity to construct, install, or extend a transmission facility within ERCOT pursuant to §25.101 of this title (relating to Certification Criteria) is entitled to recover, through the utility's wholesale transmission rate, reasonable payments made to a taxing entity in lieu of ad valorem taxes on that transmission facility, provided that:

> (A) The utility enters into a written agreement with the governing body of the taxing entity related to the payments;

> (B) The amount paid is the same as the amount the utility would have to pay to the taxing entity on that transmission facility if the facility were subject to ad valorem taxation;

> (C) The governing body of the taxing entity is not the governing body of the utility; and

> (D) The utility provides the commission with a copy of the written agreement and any other information that the commission considers necessary in relation to the agreement.

Although DME may not be required to be certificated under Rule 25.101, Staff argues Rule 25.192(c)(4) should be applied in this case to prevent the very same harm the rule attempts to prevent. DME is a department of the City, and the City is simply paying itself. Applying this provision to DME "will result in a uniform

application of the rule to all municipalities and avoid the consequences of overearning and saddling ratepayers with burdensome rates."[56]

### 4.    TIEC's Position

TIEC agrees with OPUC and Staff that the Commission should remove the 6% ROI GFT from DME's rates. TIEC emphasizes that the ROI GFT is an *elective* transfer of excess revenues to the City and not a necessary cost of doing business that should be fixed in DME's rates. Indeed, this is reflected in the City's Charter Section 12.03, which calls for a transfer from "excess revenues."[57] According to TIEC, "DME has not justified its request to have ratepayers throughout ERCOT fund the full amount of that 6% ROI on top of its debt service coverage cushion (which even at the reduced levels [sought by TIEC] would be sufficient to provide DME with a healthy return of 7.53%)."[58]

### 5.    Analysis

The ALJs determine that the Commission has the authority, under PURA § 35.004(c), to review the reasonableness of DME's inclusion of its GFTs in rates. The wholesale transmission revenue requirement is shared among all ERCOT ratepayers, and denying this authority would reduce the Commission's role to a mere formality, making ERCOT ratepayers fully responsible for whatever size GFT the City Council demands.

---

[56] OPUC Initial Br. at 4.

[57] DME Ex. 2 (Puente Dir.) at 56, Attachment WP/E-2/1.

[58] TIEC Initial Br. at 3 (citing Staff Ex. 2 (Filarowicz Dir.) at 14).

Although DME is correct in citing Texas Government Code § 1502.059, which allows the GFTs in question, it does not mandate their recovery or limit the Commission's control over their recovery. The Commission's responsibility is to ensure the recovery of reasonable costs essential for providing wholesale transmission service. Assessing DME's expenses, including the GFTs, for their reasonableness and necessity is neither discriminatory nor unprecedented, contrary to DME's argument. Staff's standard, requiring GFTs to be justified by a specific rationale related to the actual cost of service provision, should not be a matter of controversy. This standard derives from the Commission's statutory authority to review wholesale transmission rates, not the comments of a single Commissioner in another matter, as DME contends.[59]

Applying this standard, the ALJs find that DME has not demonstrated why the 6% ROI GFT should be included in rates. Unlike the Franchise Fee GFT, to which no party objects and was shown to be akin to compensation for the use of the City's rights-of-way, there is no showing that the ROI GFT relates to the actual provision of service or cost of service. Mr. Puente's testimony that the ROI GFT represent payments to the taxpayer in exchange for the City's implied or explicit guarantee of the bonds to support transmission investments is too tenuous and theoretical to support the requested cost recovery in rates. Moreover, this theory is contrary to the City's ordinance language that states the ROI GFT was being

---

[59] *See* Staff Ex. 1 (Stark Dir.) at 14 (citing the Commissioners' discussion at the January 26, 2022 Open Meeting in Docket No. 52728).

increased from 3.5% to 6% in order to "address the projected revenue shortfalls" associated with the COVID-19 pandemic.[60]

Moreover, the ALJs agree with TIEC and OPUC that Mr. Puente's testimony that the ROI payments to the City are no different than dividend payments of an IOU or the capital credits of a cooperative is misguided: dividends and capital credits are paid out of the utility's return on investment recoveries. In those instances, there are no additional payments to investors or members on top of the return calculations already included in rates for cooperatives or IOUs. Here, DME is seeking to recover its return on investment and an additional payment to the City.

The ALJs disagree, however, with OPUC's request to apply Rule 25.192(c)(4) in this proceeding to disallow the ROI GFT because the governing body of the taxing entity is the governing body of the utility. That rule expressly does not apply here because DME is not required to apply for a certificate of convenience and necessity pursuant to Rule 25.101. Moreover, application of that rule would also bar the recovery of the Franchise Fee GFT, to which no party, including OPUC, objects.

For these reasons, the ALJs recommend inclusion of the Franchise Fee GFT in DME's transmission cost of service and the exclusion of the 6% ROI GFT.

---

[60] Staff Ex. 8 (DME's Supplemental Response to Staff RFI 2-4), Attachment 2-4a.

## B. DEBT SERVICE COVERAGE

DME's request for transmission rates in this docket uses the DSC method to calculate its requested total return dollars and concomitant rate of return.[61] DSC is a measure of annual revenues in excess of operations and maintenance costs that are available to meet principal and interest payments.[62] No party contested the use of the DSC method.

DME proposes a 1.75x DSC ratio, based on the City's 1.5x DSC policy plus a 0.25x adder as allowed under the Commission's Rate Filing Package (RFP) at the time of filing.[63] In DME's initial application, DME used a 1.75x DSC ratio to calculate and request a rate of return of 11.74%.[64] In its amended application, DME used a DSC ratio of 1.75x to calculate DME's requested total return dollars (on a total company basis) of $82,170,924, resulting in a requested rate of return of 11.99%.[65] DME allocated $23,305,897 of the requested total return dollars to its transmission function.[66]

---

[61] Staff Ex. 2 at 10.

[62] DME Ex. 8 at 169.

[63] DME Ex. 10 at 4.

[64] DME Ex. 8 at 172.

[65] DME Ex. 14 at Schedule C-2.

[66] DME Ex. 14 at Schedule A.

Staff and TIEC recommend using a DSC ratio of 1.25x, resulting in an amount of return on rate base of $14,475,026 being allocated to the transmission function and yielding a rate of return of 7.53%.[67]

OPUC recommends using a DSC ratio of 1.42x as a balance between the interests of the utility and ratepayers.

In DME's April 24, 2023 Rebuttal Case, DME ultimately requests a 1.75x DSC ratio, total return dollars (on a total company basis) of $69,533,065, and a 10.19% rate of return.[68] Additionally, DME removed the amounts for principal and interest for its 2021 bond issuances and allocated $19,587,954 of the total return dollars to its transmission function.[69]

Applying Staff's and TIEC's recommended 1.25x DSC ratio to DME's Rebuttal Case results in a rate of return of 6.21%.[70] Applying OPUC's recommended 1.42x DSC ratio results in a rate of return of 7.50%.[71]

---

[67] Staff Ex. 2 at 14 and Attachment MF-2.

[68] DME Ex. 16 at 53-54, Attachment JAS-8 at 23-24.

[69] DME Ex. 16 at Schedule C-2 at Attachment JAS-8, page 3.

[70] Tr. at 104.

[71] OPUC Ex. 1 at 7-8.

24

## 1.      DSC Ratio of Bond Indentures or Ordinances

Under Commission rules, MOUs may set their return based on their debt service and a reasonable coverage ratio, considering "the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate-setting authority of the TSP."[72]

DME asserts that the City's policy[73] requires its utility system (consisting of electric, water, and wastewater services) to maintain a 1.5x DSC ratio on all outstanding revenue bonds and other indebtedness. On November 16, 2021, the City's policy increased its utilities' target DSC ratio from 1.25x to 1.5x as follows:

> The City will maintain coverage ratios as dictated by the City's outstanding bond covenants, including any other indebtedness of the Utility System. In addition, the City will follow a policy that the Utility System will maintain a debt service coverage ratio of at least 1.50 on all outstanding revenue bonds and other indebtedness of the Utility System. For this purpose, the debt coverage ratio is defined as the net revenue of the Utility System for a fiscal year (as set out in the audited financial statements for that fiscal year) divided by the maximum annual debt service for all then outstanding revenue bonds and other indebtedness of the Utility System. The City will strive to further maintain this debt coverage ratio for each separate utility.[74]

---

[72] 16 TAC § 25.192(c)(3).

[73] DME refers to it as the City's "policy," whereas Staff references it as a "resolution" in its brief. No party's briefs addressed the distinction(s) between a policy, resolution, or ordinance. The document is titled "City of Denton Policy/Administrative Procedure/Administrative Directive." DME Ex. 11 at 7.

[74] DME Ex. 11 at 13; Tr at 31-33.

25

DME's bonds are currently rated "A" by Fitch Ratings and "A+" by Standard and Poor's (S&P) Rating Services.[75] Fitch Ratings reflects a median DSC ratio for public power utilities in the "A" to "AA" category as approximately 2.0x or greater.[76] S&P Rating Services considered 1.60x or greater to be an Extremely Strong coverage category.[77] The City changed its policy to align with the standards of Fitch Ratings and S&P Rating Services.[78] DME argues that its prudent and conservative financial practices have resulted in a consistent pattern over the last eleven years of a DSC ratio of 1.50x or greater.[79]

TIEC, Staff, and OPUC contend that DME's current actual DSC ratio is 1.25x as stated in DME's current debt obligations.[80] They argue the Commission should disregard DME's request to consider a recent City policy stating that DME should strive to obtain a DSC ratio of 1.50x. TIEC argues that the rule gives the Commission discretion to consider the bond indentures *or* ordinances, and that the Commission is not required to match the higher DSC ratio of city ordinances.

---

[75] DME Ex. 8 at 50.

[76] DME Ex. 15 at 7.

[77] DME Ex. 15 at 7.

[78] DME Ex. 15 at 7.

[79] DME Ex. 15 at 25, Attachment AP-7.

[80] Staff Ex. 2 at 17.

## 2. Rate Filing Package Language

Prior to November 9, 2022, the RFP for Non-Investor Owned TSPs in ERCOT provided that "the debt service coverage levels stated in the TSP's most recently issued bond covenants plus additional coverage of 0.25 for municipal utilities [. . .] shall be presumed reasonable."[81] During the October 6, 2022 Open Meeting, the Commission noted how a "presumed adder to the DSC ratio stated in a municipal utility's bond indenture was simply too great to be justified charging ratepayers and would be unreasonable."[82] On the same date, the Commission adopted modifications to the TCOS RFP for Non-Investor-Owned Transmission Service Providers in the Electric Reliability Council of Texas, which provide that an applicant may request an additional 0.25x to the DSC ratio if the applicant shows that it has utilized short-term debt financing as an alternative to long-term debt financing in a cost-effective manner.[83]

Staff argues that modifications to the RFP for MOUs and Commissioner pronouncements about the DSC method for MOUs at a recent Commission Open Meeting apply to DME's application and support a 1.25x DSC ratio.[84] The updated RFP was adopted before DME filed its amended application. Staff and TIEC

---

[81] DME Ex. 15 at 20 (Attachment AP-3 at 5).

[82] *See* Staff Ex. 2, Attachment MF-4 at 59-61.

[83] DME Ex. 15 at Bates 22, Attachment AP-4 ("A TSP's requested return may be based on the TSP's debt service expense at the end of the Historic Year [test year] and the debt service coverage levels stated in the TSP's most recently issued bond and debt covenants. To the extent the utility can show that short-term debt has been utilized in a cost-effective manner as a reasonable alternative to long-term financing, its principal and interest and an additional coverage of 0.25[x] may be requested in calculating the return.").

[84] Staff Ex. 2 at 16.

contend that DME did not present evidence demonstrating it has utilized any short-term financing as a cost-effective alternative to long-term financing, which as previously indicated, the modified RFP identifies as a condition for a utility to demonstrate if it requests an additional 0.25x above its current, actual DSC ratio.[85]

DME argues that the RFP was improperly modified at the October 6, 2022 Open Meeting. According to DME, the Commission issued no formal notification for the change to the RFP as required, and the RFP is a Commission Prescribed Form.[86] Rule § 22.80 provides, "Prior to the implementation of any new form or significant change to an existing form, the change or new form shall be referenced in the 'In Addition' section of the Texas Register for public comment. For good cause, new forms or significant changes to existing forms may be implemented without publication on an interim basis for a period not to exceed 180 days." DME argues that the Commission did not make the required publication after implementing a significant change to the RFP.[87] Therefore, the modified RFP is invalid under the Commission's own rules, and the 0.25x additional coverage is presumed reasonable under the original RFP language. DME further posits that the Commissioner's comments at the October 6, 2022 Open Meeting are not precedential according to

[85] Staff Ex. 2 at 15.

[86] DME Ex. 15 at Bates 23-24, Attachments AP-5, AP-6; *see* 16 TAC § 22.80.

[87] DME Ex. 15 at Bates 23, Attachment AP-5.

case law,[88] and that the Commissioner's statement should not bear any evidentiary weight.

Similarly, DME contends that the modified RFP does not retroactively apply to DME's application because the modification occurred almost a year after DME filed its initial application. DME points out that the modified RFP was published without notice three weeks before DME filed its amended application.[89] According to DME, a rule may not retroactively apply if it deprives or impairs vested substantive rights under existing laws.[90] Only remedial and procedural statutes have been upheld when applied retroactively.[91] In *Pantera Energy Co. v. Railroad Commission of Texas* the court found that a rule amended by the state agency constituted a procedural change and therefore retroactively applied to pending applications.[92] DME distinguishes the present case by pointing out that: (1) the Commission did not imply the modified language applied to past transactions; and (2) the modified rule in this case affects a party's substantive rights—the calculation of DME's rate of return. According to DME, the DSC ratio is a substantive change, as it directly affects the amount a utility may recover in its TCOS, and the new RFP should not apply retroactively to DME's present application. According to DME,

---

[88] *City of Frisco v. Tex. Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. Civ. App. 1979), writ refused NRE (July 5, 1979) ("It is immaterial what a commissioner may have said or thought in the process of arriving as his decision. The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained. . .").

[89] DME Ex. 15 at 6.

[90] *Holder v. Wood*, 714 S.W.2d 318, 319 (Tex. 1986).

[91] *Ex Parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981).

[92] *Pantera Energy Co. v. R.R. Comm'n of Tex.*, 150 S.W.3d 466, 476-77 (Tex. App.–Austin 2004, no pet.) (in which the amended rule required an applicant to provide notice to affected persons listed in a different section of the rule).

the 1.50x DSC ratio of the City policy plus the presumed-reasonable 0.25x adder supports a DSC ratio of 1.75x.

## 3. Overearning

Staff and TIEC argue that DME has been overearning and collecting a significant windfall on its transmission function since 2018.[93] In TCOS proceedings each year from 2014 to 2021, DME added transmission assets to its portfolio, thereby increasing the rate base to which it could apply its high rate of return.[94] The Commission forced DME to initiate this docket based on: (1) DME's current authorized rate of return of 28.05%; (2) the fact that DME has not undergone a comprehensive Commission review of its wholesale transmission costs and revenues since 2005; and (3) DME's significant growth over the last 15 years in both its revenue levels and rate base levels, which have increased approximately thirteenfold and sixteenfold, respectively.[95]

DME has been collecting an annual transmission revenue requirement of $59,752,472,[96] and now seeks a reduced transmission revenue requirement of $35,030,428.[97] According to Staff, DME has been and is currently overearning at

---

[93] Staff Ex. 2 at 18-21.

[94] DME's Interim TCOS proceedings: Docket Nos. 42770 (filed 2014), 45071 (filed 2015), 46348 (filed 2016), 47900 (filed 2017), 48963 (filed 2018), 50110 (filed 2019), 51345 (filed 2020), 52449 (filed 2021).

[95] *See* TIEC Ex. 1 at 2-3.

[96] *Application of Denton Municipal Electric for Interim Update of Wholesale Transmission Rates*, Docket No. 52449, Notice of Approval (Oct. 25, 2021).

[97] DME Ex. 16 (Rebuttal Application), Attachment JAS-8 at 3 of 568.

least $24,722,044 annually on its transmission function.[98] Staff points out DME has been overearning—per the commonsensical meaning of the word—since at least 2018, when an interim TCOS proceeding for DME (Docket No. 47900), authorized a final transmission revenue requirement of $39,221,665,[99] which exceeds DME's requested transmission revenue requirement set forth in its Rebuttal Case.

DME counters that it is not overearning because it never earned over its authorized rate of return and has collected revenues consistent with its just and reasonable rate set by the Commission.[100] According to DME, it has provided an earnings monitoring report every year that includes the financial information necessary to evaluate whether a utility is overearning, and without completing a full rate study for each of those years based on the same methodology, the revenue requirement authorized in an interim TCOS is not comparable to the revenue requirement requested in this comprehensive filing.[101] DME asserts that the requested revenue requirement in this filing cannot be used as a comparison to any other years, including any interim updates.

---

[98] $59,752,472 - S35,030,428 = $24,722,044.

[99] *Application of Denton Municipal Electric for Interim Update of Wholesale Transmission Rates*, Docket No. 47900, Notice of Approval (Feb. 20, 2018).

[100] DME Ex. 15 at 9-10.

[101] DME Ex. 16 at 19.D.

## 4.    Rate of Return

TIEC points out that DME's last full rate case in 2005 was awarded a 28.05% authorized return, the highest rate of return for any electric utility in Texas.[102]

OPUC's witness Mark Garrett recommended using a DSC ratio of 1.42x because it balances the interests of the utility and ratepayers. OPUC argues that a DSC ratio of 1.60x is considered by S&P to be an "Extremely Strong" coverage,[103] which does not properly balance the interests of ratepayers with those of the utility. According to Mr. Garrett, a 1.42x DSC ratio would afford DME a return that is higher than its 1.25x DSC ratio required in its bond covenants and provides an overall rate of return that is comparable to rates of return of other regulated electric utilities.[104]

Mr. Garrett testified that his recommendation of a 1.42x DSC ratio would be the equivalent of a weighted average cost of capital of 7.5%, which is comparable to recent applications and Commission approvals.[105] The Commission recently approved a weighted average cost of capital of 7.501% for El Paso Electric.[106] And there are pending requests from Entergy Texas, Inc and Oncor Electric Delivery

---

[102] *See* TIEC Ex. 1 at 4.

[103] DME Ex. 15 at 7.

[104] OPUC Ex. 1 at 7-8.

[105] OPUC Ex. 1 at 7-8.

[106] OPUC Ex. 1 at 7.

Company, LLC for a weighted average cost of capital of 7.24% and 7.05% in Docket Nos. 53719 and 53601, respectively.[107]

DME argues that MOUs are markedly different from IOUs because they cannot sell equity to raise capital and thus the determination of an MOU's return is not based on the same type of analysis as an IOU in the capital marketplace.[108] According to DME, Mr. Garrett improperly "backed into" a 1.42x DSC based on El Paso Electric just requesting a 7.5% rate of return.[109] DME contends that the methodology, RFP, and City policy in the present docket differentiates this case from El Paso Electric's application.

## 5.    Analysis

Under Commission rules, "the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the Commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP."[110] The instructions in the RFP (both before and after modification) only resort to consideration of the Board of Director's policy in lieu of

---

[107] *Application of Entergy Texas, Inc. for Authority to Change Rates*, Docket No. 53719, ETI's Statement of Intent and Application for Authority to Change Rates at 5 (July 1, 2021); *Application of Oncor Electric Delivery Company LLC for Authority to Change Rates*, Docket 53601, Direct Testimony of Kevin R. Fease, at 14 (May 13, 2022).

[108] DME Ex. 16 at 14.

[109] Tr. at 72-73.

[110] 16 TAC § 25.192(c)(3).

DSC requirements stated in the TSP's bond resolutions.[111] The City's policy would be considered only if DME did not have a stated DSC ratio in its actual debt covenants. Therefore, the initial DSC ratio for consideration in this docket is the actual stated DSC ratio in DME's most recent debt issuance: 1.25x.

Even if the original RFP language applied as argued by DME, the 0.25x adder would be applied to the DSC levels "stated in the TSP's most recently issued bond covenants," not to the DSC level set forth in the City's policy.[112] Therefore, using the original RFP language with the presumed reasonable 0.25x adder would result in a DSC ratio of 1.5x, not 1.75x as requested by DME.[113]

The Commission's changes to the RFP did not invoke the publication requirements of Rule 22.80 because the rule applies only to a "significant change to an existing form." The changes to the RFP applied only to municipal utilities electing to use the DSC method, by removing a rebuttable presumption of a 0.25x adder to the actual, stated DSC ratio for a municipal utility. At the October 6, 2022 Open Meeting, the Commissioners commented on the need "to clean up the rate filing package."[114] The characterization of "cleaning up" the RFP implies that the change was not a significant change requiring publication in the Texas Register. The

---

[111] DME Ex. 15 at 20 (Attachment AP-3 at 5); Transmission Cost of Service RFP for Non-Investor-Owned Transmission Service Providers in the Electric Reliability Council of Texas at 15. "To the extent that there are no minimum debt service coverage requirements in the TSP's bond resolutions, the Board of Director's policy, with respect to coverage, shall be considered."

[112] DME Ex. 15 at Bates 16-21, Attachment AP-3 at 5.

[113] 1.25x (as stated in the most recently issued bond covenants) plus the 0.25x adder.

[114] Staff Ex. 2 at 6.

Commissioners unanimously voted to modify the RFP and remove the presumption of an adder to the stated DSC ratio for a municipal electric utility. Based on the limited changes to the RFP, the ALJs find that they did not constitute a significant change which would invoke the requirements of Rule 22.80.

The ALJs note that the RFP is not law. Nevertheless, the ALJs look to the principles of changes in law to determine whether the modifications to the RFP—if they were law—would retroactively apply to DME's pending application. Laws may not operate retroactively to deprive or impair vested substantive rights acquired under existing laws, or create new obligations, impose new duties, or adopt new disabilities in respect to transactions or considerations past; however, no litigant has a vested right in a statute or rule which affects remedy or is procedural in nature and which affects no vested substantive right. Changes in such statutes or rules are considered remedial in nature and have been held not to violate the provisions of Article 1, sec. 16 of the Constitution.[115] No litigant has a vested right in a procedural remedy.[116] Here, the Commission's modification of the RFP removed a rebuttable presumption, which is a procedural change that does not affect a vested substantive right. DME does not have a vested substantive right to the 1.75x DSC ratio it is requesting in this proceeding. Therefore, the procedural change to the RFP retroactively applies to DME's pending application. Moreover, DME filed its amended application on December 1, 2022, after the modifications to the RFP.

---

[115] *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981) (citing *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 525 (Tex. 1975); *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 649 (Tex.1971); *Deacon v. City of Euless*, 405 S.W.2d 59, 62 (Tex. 1966); et. al.).

[116] *Pantera Energy Co. v. R.R. Comm'n of Texas*, 150 S.W.3d 466, 472–73 (Tex. App. 2004) (citing *Tex. Dep't of Health v. Long*, 659 S.W.2d 158, 160 (Tex. App.–Austin 1986, no writ)).

Therefore, the ALJs find that the modified RFP language is applicable to DME's present application.

Under the modified RFP language, DME was allowed to request an additional 0.25x to the DSC ratio only if it showed that it has utilized short-term debt financing as an alternative to long-term debt financing in a cost-effective manner.[117] DME did not present evidence that it utilized short-term debt financing as an alternative to long-term debt financing. Therefore, DME's request for an additional 0.25x to its stated DSC ratio should be denied.[118]

The ALJs recommend a 1.25x DSC ratio applied to DME's Rebuttal Case, based on the DSC ratio stated in DME's most recently issued bond covenant. Thus, the ALJs recommend a rate of return of 6.21%, based on a 1.25x DSC ratio applied to DME's Rebuttal Case.

## C. OTHER REVENUES (EXPORT REVENUE)

Under Rule 25.192(e), TSPs are required to charge exporting entities for the use of the ERCOT transmission system in exporting power from ERCOT. Subsection (f) of that rule specifies that such revenue must be credited to all transmission customers:

---

[117] DME Ex. 15 at 22 (Attachment AP-4).

[118] The ALJs decline to address the claims of overearning. As no rule or RFP language expressly authorizes the Commission to consider prior or current overearning in calculating the DSC ratio, the ALJs did not consider this issue in determining their recommended DSC ratio.

**Transmission revenue.** Revenue from the transmission of electric energy out of the ERCOT region over the [direct-current interconnection] ties that is recovered under subsection (e) of this section shall be credited to all transmission service customers as a reduction in the transmission cost of service for TSPs that receive the revenue.

In its application here, DME did not include any export revenue offsets to its TCOS, and argues that it has not received any such revenues associated with the export of power from the ERCOT market. DME witness Puente testified that "[a]fter thorough investigation of TCOS revenues received during the test year, DME could not find any reference to revenues credited or paid to DME associated with the export of power from the ERCOT market. Therefore, DME does not have any [wholesale transmission service] revenue to remove from the revenue requirement."[119]

Staff counters that DME's tariff applies to distribution service providers serving ERCOT ratepayers as well as any qualified scheduling entity exporting power from ERCOT, and DME is required under both Rule 25.192(e) and PURA § 35.004(c) (requiring utilities to recover reasonable costs from third parties) to collect export charges so that DME's ERCOT customers do not bear those costs. In other words, according to Staff, a TSP such as DME is required to collect some of its TCOS via export charges calculated under Rule 25.192(e), and the remainder through its wholesale transmission rate calculated under Rule 25.192(b). According to Staff witness Ethan Blanchard, DME should have collected $17,902 in export

---

[119] DME Ex. 15 (Puente Reb.) at 15.

revenues during the test-year based on export energy volumes provided by ERCOT and the export rates specified in DME's approved wholesale transmission service tariff, as adjusted for Staff's proposed TCOS here.[120] Staff argues that this amount, or an updated amount using Mr. Blanchard's methodology, should be used to offset DME's TCOS.

DME argues that Staff's position ignores the evidence that DME did not collect any export revenues. Nor is it DME's responsibility to collect them. Rule 25.192(e)(3) states that "the entity scheduling the export of power over a direct-current interconnection (DC tie) is solely responsible to the TSP for payment of transmission service charges under this section," and DME owns no DC ties or export power over them. Therefore, it is not DME's responsibility to collect export revenues, it is the exporting customers who are required to pay DME. Adjusting DME's revenue requirement to account for revenues it did not collect is punitive and unfair, DME contends.

The ALJs agree with Staff's interpretation of Rule 25.192. Subsection (e) plainly puts the burden on TSPs to collect export charges: "[a] transmission service charge for exports of power from ERCOT *must be assessed to* transmission service customers." But instead of collecting export charges as required, DME seeks to collect the costs associated with the export of power from ERCOT ratepayers instead. Any shortfall in that respect should be recovered from DME's exporting

---

[120] Staff Ex. 3 (Blanchard Dir.) at 8.

customers, and the appropriately calculated amount of export revenues should be offset against DME's TCOS.

## D.   ADDITIONAL INTERIM TCOS FILING

Noting that DME's application was filed over a year-and-a-half ago, is based on a test year ending in 2020, and the proposed rates are calculated in relation to the ERCOT average four coincident-peak (4CP) data from 2020, Staff and TIEC recommend that DME should be required to file an interim TCOS proceeding within 90 days of the final order in this docket to update its rates to incorporate additional depreciation and to use the 2022 ERCOT average 4CP data.[121]

DME contends that requiring it to file an interim TCOS proceeding within 90 days of the final order would be discriminatory and place an undue burden on the Commission and DME. DME states that Staff's and TIEC's request ignores that DME updated its transmission plant and accumulated depreciation associated with those assets as of June 30, 2021.[122] In addition, DME notes that the rule applicable to interim TCOS filings requires non-IOU TSPs to file interim updates only after either 48 or 96 months depending on the size of the utility's revenue requirement.[123]

Given the amount of time this application has been pending, the ALJs agree with Staff's and TIEC's position that the Commission should require DME to file

---

[121] Staff Initial Br. at 14; TIEC Initial Br. at 7.

[122] DME Ex. 8 at 128-29.

[123] 16 TAC § 25.247(d).

an interim TCOS proceeding within 90 days of the final order. Rule 25.247, while setting deadlines for required TCOS filings as noted by DME, also provides:

> Nothing in this section limits the commission's authority to initiate a rate proceeding at any time under this title on the basis of other criteria that the commission determines are in the public interest, including but not limited to the information provided in a non-investor-owned transmission service provider's earnings monitoring report.[124]

This Commission required DME to file this TCOS proceeding based on its review of DME's earnings monitoring reports. However, due to significant delays in processing this application, irrespective of the cause for those delays, the information provided here may no longer be a fully reliable representation of DME's current cost of providing service. Moreover, the ALJs note that DME has filed interim TCOS proceedings every year since 2014, suggesting that initiating another such proceeding would not be overly burdensome.[125]

## E.    RATE-CASE EXPENSES

DME's request to recover rate-case expenses is uncontested. On July 21, 2023, DME filed an update of rate-case expenses incurred in this proceeding through June 30, 2023, totaling $738,327.89, along with a supporting affidavit.[126] On July 25, 2023, Staff filed supplemental testimony finding this amount to be

---

[124] 16 TAC § 25.247(d)(2).

[125] *See* Staff's Initial Br. at 4 n.4.

[126] DME Ex. 20.

reasonable and recoverable.[127] Although DME had requested that its rate-case expenses be recovered through a six-month surcharge, Staff took the position for the first time in its supplemental testimony that the requested expenses should be recovered through a 24-month surcharge.[128] Because no explanation was given to support a longer recovery period, the ALJs find that the full amount of requested rate-case expenses should be recovered through a six-month surcharge.

## III. CONCLUSION

For the reasons described above, the ALJs recommend adjustments to DME's requested TCOS that reflect the ALJs' recommendation that: DME's recovery of its GFTs should be limited to the requested Franchise Fee portion and the 6% ROI portion should be excluded from rates; DME's DSC ratio should be 1.25x; and DME's revenue requirement should be offset by the amounts it should have collected in export charges. The ALJs also recommend that: DME be authorized to recover $738,327.89 over a six-month surcharge; and DME be required to file an interim TCOS proceeding within 90 days of the final order in this docket. In support of these recommendations, the ALJs make the following findings of fact and conclusions of law.

The ALJs recommend that DME submit numbering consistent with the above recommendations to be available for the Commission to review prior to the open meeting to consider this matter.

---

[127] DME Ex. 21.

[128] DME Ex. 21 at 4.

## IV. FINDINGS OF FACT

### *Applicant*

1. Denton Municipal Electric (DME) is a municipally owned electric utility owned and operated by the City of Denton (City) under certificate of convenience and necessity number 30046.

2. DME owns and operates for compensation in Texas facilities and equipment to transmit and distribute electricity in the Electric Reliability Council of Texas (ERCOT) region.

### *Application; Amended Application*

3. On November 1, 2021, DME filed an application with the Public Utility Commission of Texas (Commission)to change its transmission cost of service (TCOS) and wholesale transmission service rates.

4. On December 12, 2021, DME filed an amendment and supplement to its application.

5. DME's application is based on a test year ending September 30, 2020.

6. In Order No. 4 issued on January 31, 2022, the Commission ALJ found that DME was not required to submit a depreciation study as part of the Commission's rate-filing package for non-investor-owned transmission service providers.

7. Staff and OPUC filed an appeal of Order No. 4 on March 4, 2022.

8. On May 12, 2022, the Commission issued an Order on Appeal of Order No. 4 granting the appeal and ordering DME to amend its application to include a depreciation study.

9. On December 1, 2022, DME filed an amended application to change its TCOS and wholesale transmission service rates, which included additional testimony and a depreciation study.

10. In the amended application, DME asked the Commission to approve an annual TCOS of $38,446,435, a transmission rate base of $194,443,862, and an annual wholesale transmission rate of $0.541980 per kilowatt (kW).

11. In the amended application, DME requested a rate of return of 11.99% calculated using a debt service coverage (DSC) ratio of 1.75x.

12. The amended application includes an 11% general fund transfer (GFT) consisting of a Franchise Fee component (Franchise Fee GFT) and a 6% return on investment component (ROI GFT) in Schedule E-2, Taxes Other Than Income Taxes.

13. DME asked to recover its reasonable and necessary rate-case expenses from its wholesale transmission service customers through a surcharge over a six-month period.

14. On May 23, 2023, the administrative law judges (ALJs) issued SOAH Order No. 14 finding the application administratively complete.

## *Notice*

15. On November 5, 2021, DME filed the affidavit of Lambeth Townsend, then-authorized legal representative for DME, attesting that notice of the application was provided by First Class Mail on November 1, 2021, to the distribution service providers (DSPs) in Docket No. 51612, Commission Staff's Petition to Set 2021 Wholesale Transmission Service Charges for the Electric Reliability Council of Texas, Inc., all parties in the last complete review of DME's transmission cost of service, Docket No. 30358, and the Office of Public Utility Counsel (OPUC).

16. In Order No. 2 issued on November 23, 2021, the Commission ALJ found the notice sufficient.

## *Intervenors*

17. In Order No. 2 issued on November 23, 2021, the Commission ALJ granted intervenor status to OPUC.

18. In Order No. 7 issued on May 5, 2022, the Commission ALJ granted intervenor status to Texas Industrial Energy Consumers (TIEC).

## *Referral to SOAH for Hearing*

19. On May 27, 2022, Staff, OPUC, and TIEC requested that this case be referred to the State Office of Administrative Hearings (SOAH).

20. On August 3, 2022, the Commission referred this case to SOAH for assignment of an ALJ to conduct a hearing.

21. On August 4, 2022, the Commission issued a preliminary order identifying 34 issues to be addressed in this proceeding.

22. On December 20, 2022, the SOAH ALJs convened a hearing on interim rates. DME offered seven exhibits, which were admitted, and Staff offered three exhibits, which were admitted.

23. On December 20, 2022, in Cause No. D-1-GN-22-006855 of the 200th Judicial District of Travis County, Texas, the court issued a temporary injunction enjoining the implementation of interim rates in this proceeding.

24. In SOAH Order No. 11 issued on January 18, 2023, the SOAH ALJs adopted a procedural schedule.

25. On May 11, 2023, SOAH ALJs Daniel Wiseman and Linda Brite convened a hearing on the merits via videoconference. The hearing on the merits concluded the same day.

26. The following parties appeared through legal counsel and participated in the hearing on the merits: DME, Staff, OPUC, and TIEC.

27. At the hearing on the merits, the SOAH ALJs admitted 19 exhibits offered by DME, 10 exhibits offered by Staff, three exhibits offered by TIEC, and 11 exhibits offered by OPUC.

28. The parties filed post-hearing initial briefs on May 26, 2023, and reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs on June 9, 2023.

29. The record closed on June 9, 2023, except that it was reopened for the limited purpose of admitting exhibites related to DME's updated rate-case expenses incurred in this docket though June 30, 2023.

## *Evidentiary Record*

30. On November 1, 2021, DME filed the initial application, the schedules and workpapers under the Non-IOU TCOS Rate-Filing Package, and the direct testimonies of Antonio Puente, Jr., Terrance P. Naulty, and Jill A. Schuepbach.

31. On December 12, 2021, DME filed the first supplemental direct testimonies of Mr. Puente and Ms. Schuepbach.

32. On December 1, 2022, DME filed the direct testimony of Laurie Tomczyk, and the second supplemental direct testimonies of Mr. Puente and Ms. Schuepbach.

33. On March 3, 2023, OPUC filed the direct testimony of Mark Garrett.

34. On March 31, 2023, Commission Staff filed the direct testimonies of Mark Filarowicz and Ruth Stark.

35. On April 10, 2023, Commission Staff filed the direct testimony Ethan N. Blanchard.

## *Rebuttal Case*

36. On April 24, 2023, DME filed its rebuttal case, consisting of the rebuttal testimonies of Mr. Puente and Ms. Schuepbach (Rebuttal Case).

37. In its Rebuttal Case, DME accepted certain recommendations by OPUC and Staff related to plant held for future use and made specific corrections to DME's expenses and revenues, leaving only three issues in dispute: (1) whether and to what extent DME should recover its GFTs; (2) the appropriate debt service coverage (DSC) and rate of return; and (3) whether DME should be required to offset its TCOS with export revenues.

38. DME's Rebuttal Case asked the Commission to approve an annual TCOS of $35,030,428, a transmission rate base of $192,251,567, and an annual wholesale transmission rate of $0.49382 per kW.

39. DME's rebuttal revenue requirement included $89,347 for Taxes Other than Income – Labor and $4,095,558 for operations and maintenance expense allocated to transmission.

40. DME's rebuttal rate base included $827,846 for materials and supplies allocated to transmission, $523,113 in cash working capital allocated to transmission, and $3,792,668 in net general plant allocated to transmission.

41. DME's Rebuttal Case asked for a rate of return of 10.19%.

## *General Fund Transfers*

42. A trade-off for the benefits to the citizens of Denton for local ownership and control of their own electric utility (i.e. control over issues like rate-setting and quality of service) is that the City does not collect all the other fees and taxes from its MOU that it would from utilities that were not owned by the City.

43. Requiring a utility to substantiate all its transfers to the general fund falls within the Commission's discretion to ascertain the reasonableness of such costs.

44. DME's ROI GFT must first be determined to be reasonable by the Commission before it can be included in DME's wholesale transmission rates that are socialized to all of ERCOT.

45. Denton raised the ROI portion of the GFT for its electric utility (i.e., DME) to 6% of gross revenues while maintaining the previous 3.5% ROI for its water and wastewater utilities. The stated purpose of raising the rate (which was purported to be a temporary increase) was because of COVID-19.

46. Denton provided no explanation or justification for reasonableness of the increased 6% ROI rate for its electric utility when its water and wastewater utilities pay a 3.5% ROI, or why the 6% electric ROI was made permanent when it was supposed to be a temporary increase due to COVID-19.

47. Requiring justification for DME's requested ROI GFT, as well as justification for a municipality's disparate treatment of its electric utility from its water and wastewater utilities with respect to its ROI GFT, is not burdensome and within the Commission's authority.

48. DME has established the reasonableness of the Franchise Fee component of its general fund transfer but has not sufficiently substantiated the remaining 6% for ROI component.

### *Other Revenues/Export Revenue*

49. DME's TCOS should be offset by the amount of export revenues it should have collected during the test year.

### *Debt Service Coverage and Rate of Return*

50. The instructions in the rate filing package (RFP), both before and after modification, provide that the Commission only resorts to consideration of the Board of Director's policy in lieu of DSC requirements stated in the transmission service provider's (TSP) bond resolutions.

51. The stated DSC ratio in DME's most recent debt issuance is 1.25x.

52. At the time of DME's initial application, the RFP provided that the DSC levels stated in the TSP's most recently issued bond covenants plus additional coverage of 0.25 for municipal utilities shall be presumed reasonable.

53. The RFP is not law.

54. The Commission's October 6, 2022 modification of the RFP removed a rebuttable presumption, which is a procedural change that does not affect a vested substantive right.

55. The modified RFP provides that an applicant may request an additional 0.25x to the DSC ratio if the applicant shows that it has utilized short-term debt financing as an alternative to long-term debt financing in a cost-effective manner.

56. DME's amended application was filed on December 1, 2022, after the RFP was modified.

57. No evidence was presented showing that DME utilized short-term debt financing as an alternative to long-term debt financing.

58. The 1.25x DSC ratio set forth in DME's most recent debt issuance should be adopted and applied to DME's Rebuttal Case, which results in a rate of return of 6.21%.

### *Interim TCOS Filing and Rate-Case Expenses*

59. Given the particular circumstances of this docket, it is in the public interest to require DME to file an interim TCOS proceeding within 90 days of the final order in this docket.

60. DME's proposed rate-case expenses of $738,327.89 comply with PURA § 35.004(c).

61. DME should recover its rate-case expenses incurred in this docket through a separate surcharge over a six-month period.

## V. CONCLUSIONS OF LAW

1. The Commission has jurisdiction over this proceeding under Public Utility Regulatory Act (PURA) §§ 35.004, 35.006, and 40.004(1).

2. DME is a municipally owned utility as defined in PURA § 11.003(11) and an electric utility as defined in PURA § 35.001 for the purpose of wholesale transmission service.

3. DME is a TSP as defined in 16 Texas Administrative Code (TAC) § 25.5(141) that provides transmission service as defined in PURA § 31.002(20).

4. The Commission processed the application in accordance with the requirements of PURA, the Administrative Procedure Act, and Commission rules.

5. DME provided notice of the application in compliance with 16 TAC § 22.55.

6. DME's application complies with the requirements of 16 TAC § 25.192.

7. PURA § 35.004(c) states that Commission shall ensure that the utility recovers its reasonable costs in providing wholesale transmission service.

8. A TSP in the ERCOT region may seek authority to change its transmission rates under 16 TAC § 25.192(g).

9. The return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the Commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP. 16 TAC § 25.192(c)(3).

10. The Commission's modifications to the RFP were not a significant change which would invoke the requirements of 16 TAC § 22.80.

11. Laws may not operate retroactively to deprive or impair vested substantive rights acquired under existing laws, or create new obligations, impose new duties, or adopt new disabilities in respect to transactions or considerations past; however, no litigant has a vested right in a statute or rule which affects remedy or is procedural in nature and which affects no vested substantive right. Changes in such statutes or rules are considered remedial in nature and have been held not to violate the provisions of Article 1, sec. 16 of the Constitution. *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981) (citing *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 525 (Tex. 1975); *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 649 (Tex. 1971); *Deacon v. City of Euless*, 405 S.W.2d 59, 62 (Tex. 1966).

12. Texas Government Code (Tex. Gov't Code) § 1502.059 grants a city the authority to make transfers to its general fund from its municipally owned utilities but does not require such transfer to be included in the rates of those utilities.

13. Tex. Gov't. Code § 1502.057 explicitly identifies which expenses must be included in an MOU's rates and does not include general fund transfers as items that must be included.

14. PURA does not specify any required treatment in wholesale transmission rates transfers by municipally owned utilities to the general funds of their respective cities.

15. Under 16 TAC § 25.192(e), TSPs are required to charge exporting entities for the use of the ERCOT transmission system in exporting power from ERCOT. Subsection (f) of that rule specifies that such revenue must be credited to all transmission customers.

16. DME did not collect export charges as required by 16 TAC § 25.192.

17. The Commission has the authority to initiate a rate proceeding at any time under this title on the basis of other criteria that the commission determines are in the public interest, including but not limited to the information provided in a non-investor-owned transmission service provider's earnings monitoring report. 16 TAC § 25.247(d)(2).

18. An MOU may recover its reasonable rate-case expenses. PURA § 35.004(c).

## VI. PROPOSED ORDERING PARAGRAPHS

1. The Commission approves DME's TCOS and wholesale transmission rates to the extent provided by this Order.

2. The Commission establishes DME's annual TCOS revenue requirement as $_____, effective the date of this Order.

3. The Commission establishes DME's wholesale transmission rate as $_____/kW per year, effective the date of this Order.

4. The Commission establishes DME's export rates as described in Finding of Fact No. ____, effective the date of this Order.

5. DME shall recover $738,327.89 for rate-case expenses incurred in this proceeding through a six-month surcharge as requested.

6. DME shall file an interim TCOS proceeding no later than 90 days after this order is issued.

7.  Within ____ days of this Order, DME shall file with the Commission a clean copy of the approved wholesale transmission service tariff to be stamped "approved" and retained by Central Records.

8.  The Commission denies all other motions and any other requests for general or specific relief that the Commission has not expressly granted.

**SIGNED August 8, 2023.**

Daniel Wiseman,

Administrative Law Judge

Linda Brite,

Administrative Law Judge

Proposal for Decision, SOAH Docket No. 473-22-07688,
Referring Agency No. 52715

# Appendix 3

Direct Testimony of Ruth Stark
Project No. 52715, Tex. Pub. Util. Comm'n
(Mar. 31, 2023) (AR 113)



# Filing Receipt

**Received - 2023-03-31 02:31:18 PM**
**Control Number - 52715**
**ItemNumber - 138**

SOAH DOCKET NO. 473-22-07688
PUC DOCKET NO. 52715

| | | |
|---|---|---|
| APPLICATION OF DENTON MUNICIPAL ELECTRIC TO CHANGE RATES FOR WHOLESALE TRANSMISSION SERVICE | §<br>§<br>§<br>§<br>§ | BEFORE THE STATE OFFICE<br><br>OF<br><br>ADMINISTRATIVE HEARINGS |



DIRECT TESTIMONY OF RUTH STARK

RATE REGULATION DIVISION

PUBLIC UTILITY COMMISSION OF TEXAS

MARCH 31, 2023

000001

# TABLE OF CONTENTS

I. QUALIFICATIONS ................................................................................................ 1

II. PURPOSE OF TESTIMONY ................................................................................. 2

III. SUMMARY OF DME'S REQUEST ..................................................................... 4

IV. STAFF REVENUE REQUIREMENT .................................................................. 4

    A.    Compliance with the Commission's Order in Project No. 50655 ........................... 5
    B.    General Fund Transfer ........................................................................................ 8
    C.    Plant Held for Future Use ................................................................................. 13
    D.    Rate-Case Expenses ........................................................................................ 14

## ATTACHMENTS

| | |
|---|---|
| Attachment RS-1 | List of Previous Testimony |
| Attachment RS-2 | Staff Transmission Cost of Service |
| Attachment RS-3 | DME Response to Staff RFI No. 3-2 |
| Attachment RS-4 | City of Denton Ordinance No. 20-875 |
| Attachment RS-5 | Bond Statement |
| Attachment RS-6 | DME Response to Staff RFI No. 2-2(d) |
| Attachment RS-7 | Open Meeting Transcript Jan. 26, 2023 |

## I. QUALIFICATIONS

**Q. Please state your name and business address.**

A. Ruth Stark, 1701 North Congress Avenue, Austin, Texas 78711.

**Q. By whom are you employed and in what capacity?**

A. I am employed by the Public Utility Commission of Texas (Commission) as a Senior Regulatory Accountant in the Rate Regulation Division.

**Q. What are your principal responsibilities?**

A. My responsibilities include testifying as a witness on accounting matters in rate cases and other proceedings at the Commission and participating in the overall examination, review, and analysis of rate change and other applications.

**Q. Please briefly state your educational background and professional experience.**

A. I received a Bachelor of Business Administration degree with a major in Accounting from the University of Texas at Austin in 1983. I am a Certified Public Accountant licensed in the State of Texas. I have accounting experience in public practice, industry, and state government. My public accounting responsibilities included tax and financial services to individuals, private enterprises, and non-profit organizations. As the accountant for a multi-divisional construction, engineering, and surveying company, I oversaw all accounting functions from maintaining the general ledger through financial statement and tax return preparation. At the Texas Water Development Board, I performed administrative duties associated with a federal construction grant program and state revolving loan fund related to municipal capital improvement projects. Except for the three-month period encompassing October through December of 2015, I have been employed with the Commission since September of 1990. Prior to my retirement in

September of 2015, I held the position of Director of Financial Review in the Rate Regulation Division for 16 years.

**Q.** **Have you previously testified before the Commission?**

**A.** Yes. Attachment RS-1 presents a summary of the dockets in which I have testified.

**II.** **PURPOSE OF TESTIMONY**

**Q.** **What is the purpose of your testimony in this proceeding?**

**A.** The purpose of my testimony is to present Staff's revenue requirement and rate base for the City of Denton's (City) municipally owned electric utility, Denton Municipal Electric (DME), based on its transmission cost of service (TCOS) application (Application) filed on November 1, 2021,[1] as revised by its amended application (Amended Application) filed on December 1, 2022.[2]

**Q.** **Which specific items in DME's Amended Application do you address in your testimony?**

**A.** My testimony addresses the Commission's order to use a September 30, 2020 test year in this proceeding, the transfer of funds by DME to the City's general fund, the balance of plant held for future use included in the requested rate base, and the requested rate-case expenses for this proceeding.

---

[1] *Statement of Intent to Change Rates for Wholesale Transmission Service*, Docket No. 52715 (Application) (Nov. 1, 2021).

[2] Amended Application (Dec. 1, 2022).

Q. **What is the basis of your recommendation?**

A. My recommendation is based on my review and analysis of DME's testimony and other information in its Application and Amended Application, its responses to various requests for information (RFIs), and the Commission's order in Project No. 50655.[3]

Q. **What statutory provisions are relevant to the application of DME?**

A. I am applying the standards set forth in Texas Utilities Code Title II, the Public Utility Regulatory Act (PURA). Chapter 35 of PURA governs the provision of transmission service by municipally owned utilities like DME.

Q. **What Commission rules did you consider when reviewing the reasonableness of DME's request in this proceeding?**

A. I considered the provisions of 16 Texas Administrative Code (TAC) § 25.192 that set forth the specific components that are the basis for transmission service rates. Following the directions presented in the Commission's August 4, 2022 *Preliminary Order*, I also considered 16 TAC § 25.231, otherwise known as the Commission's cost of service rule, and 16 TAC § 25.245, which governs the determination of the reasonableness of rate-case expenses for electric utilities.

Q. **On whose behalf are you testifying?**

A. I am testifying on behalf of the Commission Staff.

---

[3] *Year-End 2019 Electric Utility Earnings Reports in Accordance with 16 TAC § 25.73*, Project No. 50655, Order (Oct. 16, 2020).

III.          SUMMARY OF DME'S REQUEST

Q.     **Please summarize DME's request in this case.**

A.     DME requests an annual transmission revenue requirement of $38,446,435.[4]  DME also requests approval of a rate-case expense surcharge to recover over a six-month period all of its reasonable and necessary rate-case expenses associated with this proceeding.[5] DME's last comprehensive rate case, Docket No. 30358, occurred almost 18 years ago.[6] DME explains that it filed its Application based on the Commission's notice to the City in Project No. 50655 of its intention to inquire into the reasonableness of DME's wholesale transmission rates, including the order for DME to file a rate filing package by November 1, 2021, based on a test year ending on September 30, 2020.[7]

IV.    STAFF REVENUE REQUIREMENT

Q.     **Please summarize Staff's recommended transmission revenue requirement and rate base for DME.**

A.     Staff's recommended transmission revenue requirement for DME is $27,943,854, a reduction of $10,502,501 to DME's request.  Staff's recommended rate base (based on the June 30, 2021 balance of transmission plant investment) is $192,274,703.  These items are the result of the combined recommendations of Staff witnesses Mark Filarowicz, Ethan Blanchard, and myself.  They also incorporate corrections of errors and omissions identified by DME in response to Staff RFI Nos. Staff 2-8 and Staff 2-10.  The Staff-recommended revenue requirement and rate base are presented on Attachment RS-2 appended hereto.  Please refer to the testimonies of Mr. Filarowicz and Mr. Blanchard for

---

[4] Second Supplemental Direct Testimony of Jill A. Schuepbach (Schuepbach Second Supplemental Direct) at 9, Table 1, DME Transmission Cost of Service (Dec. 1, 2022).

[5] Application at 2.

[6] *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service,* Docket No. 30358, Order (Jun. 15, 2005).

[7] Direct Testimony of Antonio Puente, Jr. (Puente Direct) at 12:14-20.

**DIRECT TESTIMONY OF RUTH STARK**

details regarding their recommendations. Additionally, I recommend that the Commission allow DME to recover rate-case expenses of $62,767 incurred through October 15, 2021 for this proceeding. My specific recommendations are discussed below.

**A.      Compliance with the Commission's Order in Project No. 50655**

**Q.      Does DME's Application adhere to the Commission's order in Project No. 50655?**

A.       DME claims that its Application adheres to the Commission's order in Project No. 50655 and that its Application is based on a test year ending on September 30, 2020 as directed.[8] However, DME's requested rate base in this case is based on its gross plant and accumulated depreciation at June 30, 2021, which DME refers to as the "Test Year Balance" of these items.[9] DME asserts that the Commission approved its requested transmission plant balance at June 30, 2021 in its most recent interim TCOS case, Docket No. 52449,[10] but does not explain how its adjustments related to the June 30, 2021 plant balances comply with the directive to use a test year ending September 30, 2020. DME's Application also reflects changes to other components of its revenue requirement that result from the changes to plant in service.

**Q.      Did DME request a post-test year adjustment (PTYA) to its September 30, 2020 plant in service balance to include the June 30, 2021 balances? If so, does inclusion of the June 30, 2021 plant balances in this proceeding comply with the requirements of 16 TAC § 25.231(c)(2)(F), the Commission's PTYA rule [Preliminary Order Issue No. 16]?**

A.       DME claimed that it made adjustments that were "reclassifications of plant" and adjustments to "update balances to 6/30/2021." DME has not, however, addressed whether

---

[8] Puente Direct at 13:1-4.

[9] Direct Testimony of Jill A. Schuepbach (Schuepbach Direct) at 6 and 12, Table 4.

[10] *Application of Denton Municipal Electric for Interim Update of Wholesale Transmission Rates*, Docket No. 52449, Notice of Approval (Oct. 25, 2021).

inclusion of the June 30, 2021 plant balances complies with 16 TAC § 25.231(c)(2)(F), and there is not enough information in its application to confirm compliance.

**Q.    What are the requirements of 16 TAC § 25.131 with respect to PYTAs?**

A.    The requirements of 16 TAC § 25.131(c)(2) related to PTYAs are as follows:

> (F)    Requirements for post test year adjustments.
>
> (i)    Post test year adjustments for known and measurable rate base additions (increases) to historical test year data will be considered only as set out in subclauses (I)-(IV) of this clause.
>
> (I)    Where the addition represents plant which would appropriately be recorded:
>
> (-a-)    for investor-owned electric utilities in FERC account 101 or 102;
>
> (-b-)    for electric cooperatives, the equivalent of FERC accounts 101 or 102.
>
> (II)    Where each addition comprises at least 10% of the electric utility's requested rate base, exclusive of post test year adjustments and CWIP.
>
> (III)    Where the plant addition is deemed by this commission to be in-service before the rate year begins.
>
> (IV)    Where the attendant impacts on all aspects of a utility's operations (including but not limited to, revenue, expenses, and invested capital) can with reasonable certainty be identified, quantified and matched. Attendant impacts are those that reasonably follow as a consequence of the post test year adjustment being proposed.
>
> (ii)    Each post test year plant adjustment will be included in rate base at:
>
> (I)    the reasonable test year-end CWIP balance, if the addition is constructed by the electric utility; or,
>
> (II)    the reasonable price, if the addition represents a purchase, subject to original cost requirements, as specified in Public Utility Regulatory Act § 36.053.

**Q.    For which specific provisions of the rule are you unable to ascertain compliance?**

A.    There is no evidence that each addition through June 30, 2021 comprises at least 10% of DME's requested rate base, exclusive of the post test year adjustments and CWIP balances,

and there is no evidence that, even if each addition is at least 10% of the requested rate base, that each addition included through June 30, 2021 is only included at the September 30, 2020 test-year end CWIP balance as required by the rule.

The Proposal for Decision (PFD) in Docket No. 43695, as adopted by the Commission, explained that the requirement for *each* addition to be at least 10% of rate base in the PTYA rule would be meaningless if additions *totaling* at least 10% of rate base were permitted.[11] The Docket No. 43695 PFD further reasoned that doing so would defeat the Commission's stated purpose to "eliminate litigation related to immaterial adjustments."[12]

**Q.** **Do you take exception with DME's inclusion of the June 30, 2021 plant balances in its requested rate base in this case without demonstrating compliance with 16 TAC § 25.231(c)(2)(F)?**

**A.** If DME's return on rate base in this case was to be determined using the traditional rate of return method, I would take exception to its use of the June 30, 2021 balance of plant in service rather than the September 30, 2020 test year-end balance. The filing of an interim TCOS update in Docket No. 52499 did not obviate the expressed test year requirement of the Commission's order in Project No. 50655 and did not automatically entitle DME to reflect a PTYA with respect to plant additions subsequent to the ordered test year end. However, because DME has chosen to use the Debt Service Coverage (DSC) method, and because of how the return amount is determined under this method, use of the June 30, 2021 plant balances does not increase the return dollars in DME's transmission revenue requirement and therefore does not harm ratepayers in this case. Use of the June 30, 2021 plant balances actually benefits ratepayers in this instance so I have no issue with DME's requested plant in service balance in this proceeding. Please refer to the testimony of Staff

---

[11] *Application of Southwestern Public Service Company for Authority to Change Rates,* Docket No. 43695, Proposal for Decision at 26 (Oct. 12, 2015).

[12] *Id.*

witness Mark Filarowicz for an explanation of the calculation of return using the DSC method.

**Q. Can you opine on the Docket No. 52449 Notice of Approval at Ordering Paragraph No. 6, which requires that "The interim rates set in this Notice of Approval must be reconciled in Denton's next transmission cost of service rate case as provided in 16 TAC § 25.192(h)(2)"?**

A.  Yes. The Notice of Approval in Docket No. 52449 was issued on October 25, 2021, exactly one week before the Application in this case was filed, making this case the "next transmission cost of service rate case" contemplated by Ordering Paragraph No. 6. The interim rate reconciliation provision of the rule anticipates a review of the amounts (costs) included in the interim rates to ensure that they are consistent with 16 TAC § 25.192(h)(2), as well as a review of the reasonableness of the interim plant additions included in the interim rates. Denton provided information in this case related to the reasonableness of its plant additions since the end of the test year in its last full rate case, Docket No. 30358, including the plant additions reflected in the Docket No. 52449 interim rates. Staff has reviewed the information provided by DME in this proceeding and has no issue with the interim rates that resulted from Docket No. 52449.

**B.      General Fund Transfer**

**Q. Please explain your next proposed adjustment to DME's request.**

A.  My second proposed adjustment is the disallowance of the return on investment (ROI) portion of the general fund transfer (GFT) included in the taxes other than income taxes component in DME's requested revenue requirement.

**Q. What is a GFT?**

A.  Many cities that own utilities make annual fund transfers from their municipal utilities into the cities' general funds to be used for general purposes. These types of transfers are

referred to by different names based on how the ordinances or policies that create them are designed. The amounts transferred are also calculated in different ways based on the specific purpose of the transfers as outlined in the ordinances or policies that authorize them.

**Q.   Please describe the GFTs from DME to the City of Denton.**

A.   According to the testimony of DME witness Mr. Puente, transfers to the general fund include costs that DME would have to pay if not for that fact that it is a business unit of the City.[13] These include franchise fees, Charter fees, and DME's share of core City services like legal, finance, human resources, and city administration.[14] Mr. Puente also explains that the costs for shared core services are allocated based on various methods such as the number of positions, number of transactions, number of computers, etc., and that transfers to internal services funds are allocated on various metrics based on services directly provided to DME like desktop support, GIS management, procurement, and repairs.[15]

**Q.   Does DME make other GFTs to the City of Denton?**

A.   Yes. In addition to the GFTs for operating expenses discussed above, DME pays the City a franchise fee of 5% of its gross revenues[16] and a return on investment (ROI) of 6% of revenues.[17]

**Q.   What explanation did DME provide for its inclusion of the franchise fee and ROI GFTs in its TCOS revenue requirement?**

A.   DME witness Mr. Puente asserts that "The payment of a franchise fee creates an equal playing field with investor-owned utilities and electric/gas cooperatives, which pay similar

---

[13] Puente Direct at 20:14-15.

[14] *Id.* at 20:15-17.

[15] *Id.* at 20:17-24.

[16] *Id.* at 21:26-27.

[17] Second Supplemental Direct Testimony of Antonio Puente, Jr. (Puente Second Supplemental Direct) at 5:1-18.

**DIRECT TESTIMONY OF RUTH STARK**

fees to the City."[18] Additionally, Mr. Puente provided a copy of an ordinance adopted by the City of Denton on September 27, 2022 formalizing the ROI payments from the City's utility funds to the General Fund, and making permanent the City's policy of using a 6% ROI payment from the Electric Fund.[19] This Ordinance states that the City Council desires to formalize the return on equity payment for the Electric Fund at 6%, the Water Fund at 3.5% and the Wastewater Fund at 3.5%.[20] Additionally, DME witness Ms. Schuepbach explained that the City Charter requires DME to pay these transfers and that they are used to help fund the operations of the City government.[21] Ms. Schuepbach also points out that credit rating agencies consider GFTs as operating expenses when setting or reviewing credit ratings.[22]

**Q.     Why is the ROI rate for the Electric Fund higher than the rate for the Water and Wastewater Funds?**

A.     The ROI portion of the GFT paid by all of Denton's municipally owned utilities (electric, eater, wastewater) was 3.5% until April 21, 2020, when the rate was raised to 6% for the electric utility (DME) only.[23] City of Denton Ordinance No. 20-875 explained that the ROI rate of the electric utility was raised in response to the impacts from COVID-19 effective until September 30, 2022.[24] In an official statement related to the issuance of utility system bonds in August of 2021, the City reiterated that the electric utility ROI was *temporarily* raised to 6% in response to the COVID-19 pandemic:

The Electric System enterprise fund annually transfers an amount to the

---

[18] Puente Direct at 22:6-8.

[19] Puente Second Supplemental Direct at 5:7-14.

[20] *See* City of Denton Ordinance No. 22-1804 at Attachment RS-3, page 2 of 5.

[21] Schuepbach Direct at 24:14-18.

[22] *Id.* at 24:20-21

[23] *See* City of Denton Ordinance No. 20-875 included in DME's Response to Staff RFI No. 2-4 at Attachment RS-4.

[24] *Id.*

General Fund of the city to reimburse for the Electric System's share of administrative overhead of the City. The Electric System also makes an annual transfer to the General Fund in lieu of a franchise payment equal to 5% of the Electric System's revenues. In addition, the City Charter provides that the City shall be entitled to receive an annual return on its net investment from excess revenues, if any, of the Electric System not more than 6% of the net investment as a "return on investment." In satisfaction of this Charter requirement, the Electric System annually makes an additional transfer to the General Fund of the City in an amount calculated at 3.5% of revenues. For fiscal years 2021 and 2022, the amount of the "return on investment" was increased to 6% by action of the City Council.[25]

To react to COVID-19 pandemic, Public Utilities Board and City Council approved ROI to increase from 3.5% to 6%. The ROI is expected to return to 3.5% in FY 2022-23.[26]

As shown above, the ROI rate of 6% was supposed to be a temporary increase for a short period in reaction to the COVID-19 pandemic, after which it was expected to revert back to 3.5%.[27] The City of Denton was asked to provide an explanation for why the alleged "temporary" return on investment increase for the Electric System was made permanent and, importantly, why only the rate of return for the Electric System was increased because of COVID-19 while the rates of return on investment of the Water System and Wastewater System were not increased. Although it is a department of the City of Denton, and the City of Denton is the applicant in this proceeding, DME claims that it is not privy to the City Council's justification for retaining the Electric Fund increase and that the City Council has the discretion to determine and change the ROI of each utility fund as long as the amounts are within the total authorized transfers determined by City Charter and Ordinances.[28]

---

[25] Additional Information Pertaining to the Application – Voluminous WP/B-1/1 and Voluminous WP/C-2/2 (Nov. 1, 2022). *See* Item No. 3 on the Interchange (native file Voluminous WP C-2-2 - 2021 Bonds Official Statement) at "Official Statement regarding $141,990,000 City of Denton Utility System Revenue Refunding Bonds, Taxable Series 2021" dated August 26, 2021 (Bond Statement) at page 20. *See* Attachment RS-5.

[26] *Id.* at Footnote Number 2.

[27] *Id.*

[28] *See* DME's response to Staff RFI No, 3-2 at Attachment RS-3.

**DIRECT TESTIMONY OF RUTH STARK**

Q.   **What is your recommendation with respect to DME's requested franchise fee and ROI GFTs?**

A.   I propose to include the franchise fee portion of the GFT, which is 5% of transmission operating revenues, in DME's transmission cost of service, and I recommend exclusion of the total amount of the 6% ROI GFT.

In addition to Mr. Puente's explanation that the payment of a franchise fee creates an equal playing field with investor-owned utilities and electric and gas utilities that pay similar fees to the City of Denton, DME's Response to Staff RFI 2-2(d) confirms that DME's franchise fee payments at 5% of its revenues are consistent with the franchise rates charged to other utilities operating within the City.[29] Inclusion of the franchise fee payment is also consistent with a recent Commission discussion regarding fund transfers of this type.[30]

With respect to the referenced Commission discussion of similar fund transfers, although supportive of a franchise fee GFT at a rate comparable to that charged other utilities operating within the municipality, the Commission also expressed concern that the municipal utility that was the subject of the discussion should only be allowed to recover GFTs that can be justified by a specific rationale related to the actual cost of the provision of service and not just GFTs as additional compensation.[31] As explained by the City of Denton itself, the franchise fee and return on investment GFTs are made after the electric system has provided for the payment of operating expenses and debt service requirements:[32]

> The amount transferred to the General Fund for administrative overhead is an operating expense of the Electric System, while amounts transferred as franchise fees and as a return on investment are made after the Electric

---

[29] *See* DME's Response to Staff RFI No. 2-2(d) at Attachment RS-6.

[30] Open Meeting Tr. at 36:5-13 (Jan. 26, 2023). *See* Attachment RS-7.

[31] Open Meeting Tr, at 36:13-17 (Jan. 26, 2023). *See* Attachment RS-7.

[32] Bond Statement at 20. *See* Attachment RS-5.

System has provided for the payment of operating expenses and debt service requirements.[33]

DME's ROI GFT is by its own admission not an operating expense or a payment for debt service; accordingly, it is additional compensation that is not justified by a specific rationale related to the actual cost of the provision of service.

In addition to the concerns expressed by the Commission with respect to GFTs that are merely compensation and not related to the actual cost of providing service, DME has not provided support for the reasonableness of an additional return amount that is over and above the return dollars provided to DME (and by extension to the City of Denton) using the DSC method. The fact that the City (the actual applicant in this proceeding) chooses to require such payment from DME does not make it reasonable for all ratepayers in ERCOT to support this additional return on investment payment to the City to fund its other operations unrelated to the provision of electric service. This is especially so given that the ROI payment is not an arms-length transaction where an independent third party is imposing a cost on DME, and thus a much higher hurdle should be imposed to prove the reasonableness of including such payment in rates.

## C.      Plant Held for Future Use

Q.    **Please explain your adjustment to DME's request to include plant held for future use in its invested capital balance.**

A.    DME noted that it has included costs associated with a future substation in its requested rate base.[34] DME explained that it purchased property in 2019 with the intent to construct a substation based on anticipated load growth, and that the costs included in Schedule B-6, plant held for future use, include engineering and design costs to integrate the substation

---

[33] *Id.*

[34] Direct Testimony of Terrance P. Naulty at 12:17-20.

into the DME transmission grid.[35] According to DME, actual load growth was less than forecasted and it was determined that the new substation will not be needed until 2035.[36] Based on Commission precedent that precludes the inclusion of plant held for future use in rate base absent a definitive plan to put the property in service within ten years, DME's requested plant held for future use does not meet the Commission standard for inclusion.[37] I therefore recommend exclusion of this item from DME's approved transmission invested capital balance in this proceeding.

### D.    Rate-Case Expenses

**Q.    Please explain DME's request related to rate-case expenses.**

A.    DME requests recovery of its reasonable and necessary rate-case expenses incurred for this proceeding.[38] DME proposes to recover its rate-case expenses through a surcharge assessed over a six-month period.[39] The expenses presented for review and requested to date by DME total $62,767 as of October 15, 2021.[40]

**Q.    Has DME incurred additional rate-case expenses associated with this proceeding?**

A.    Yes. DME provided copies of additional rate-case expense invoices in response to a discovery request from the Office of Public Utility Counsel totaling $359,497,[41] bringing the total rate-case expenses incurred to date for this proceeding to $422,264.

---

[35] *Id.* at 13:17-19.

[36] *Id.* at 14:5-7.

[37] *See* for example *Application of CenterPoint Electric Delivery Company, LLC for Authority to Change Rates,* Docket No. 38339, Order on Rehearing at Finding of Fact No. 63 (Jun. 23, 2011).

[38] Direct Testimony of William A. Faulk, III at 5:1-3, adopted by Jamie L. Mauldin (Mauldin Direct). *See* Denton Municipal Electric's Substitution and Adoption of Testimony (Feb. 28, 2023)

[39] Application at 4.

[40] Mauldin Direct at 5:1-3.

[41] Denton Municipal Electric's Response to Office of Public Utility Counsel's First Request for Information, Question No. OPUC 1-6 (Mar. 3, 2023).

**DIRECT TESTIMONY OF RUTH STARK**

**Q.** **What is your recommendation with respect to the requested rate-case expenses?**

**A.** I recommend approval for recovery of the $62,767 of rate-case expenses incurred for this proceeding through October 15, 2021, as requested in DME's application. I have reviewed the documentation provided by DME, including the supporting testimony of Jamie L. Mauldin. Using 16 TAC § 25.245 as a guide, the requested rate-case expenses were supported by detailed monthly billings and other documentation. Based on my review of the information provided, I found that the requested expenses are reasonable and recoverable under PURA § 35.004(c). More specifically I found that:

- The requested amount of rate-case expenses does not include fees paid to, tasks performed by, or time spent on a task by an attorney or other professional that were either extreme or excessive.

- The requested amount of rate-case expenses does not include expenses incurred for lodging, meals and beverages, transportation, or other services or materials that were either extreme or excessive.

- The requested amount of rate-case expenses does not contain any amounts for duplication of services or testimony.

- The requested amount of rate-case expenses is not disproportionate, excessive, or unwarranted in relation to the nature and scope of the proceedings for which DME is seeking recovery or reimbursement.

**Q.** **What is your recommendation regarding the $359,497 of additional rate-case expenses that DME identified in response to RFI No. OPUC 1-6?**

**A.** DME has not requested those additional expenses and has not provided testimony or affidavit supporting the reasonableness of the expenses. DME indicated that it expects to update its requested rate-case expenses for this proceeding at the hearing on the merits.[42] However, I recommend that DME provide its updated request for rate-case expenses prior to the hearing in its rebuttal testimony and that the ALJs provide Staff and the other parties

---

[42] Mauldin Direct at 5:1-3.

**DIRECT TESTIMONY OF RUTH STARK**

to this proceeding an opportunity to thoroughly review the updated request and provide updated testimony addressing that request and the appropriate recovery period.

**Q.    Does this conclude your testimony?**

A.    Yes.

# Appendix 4

Tex. Util. Code § 35.004

KeyCite Red Flag

Enacted Legislation   Amended by   2025 Tex. Sess. Law Serv. Ch. 953 (S.B. 6) (VERNON'S),

KeyCite Yellow Flag

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Utilities Code (Refs & Annos)
    Title 2. Public Utility Regulatory Act (Refs & Annos)
      Subtitle B. Electric Utilities (Refs & Annos)
        Chapter 35. Energy Providers
          Subchapter A. Competition and Transmission Access in the Wholesale Market

V.T.C.A., Utilities Code § 35.004

§ 35.004. Provision of Transmission Service

Currentness

(a) An electric utility or transmission and distribution utility that owns or operates transmission facilities shall provide wholesale transmission service at rates and terms, including terms of access, that are comparable to the rates and terms of the utility's own use of its system.

(b) The commission shall ensure that an electric utility or transmission and distribution utility provides nondiscriminatory access to wholesale transmission service for qualifying facilities, exempt wholesale generators, power marketers, power generation companies, retail electric providers, and other electric utilities or transmission and distribution utilities.

(c) When an electric utility, electric cooperative, or transmission and distribution utility provides wholesale transmission service within ERCOT at the request of a third party, the commission shall ensure that the utility recovers the utility's reasonable costs in providing wholesale transmission services necessary for the transaction from the entity for which the transmission is provided so that the utility's other customers do not bear the costs of the service.

(d) The commission shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission, other than costs described by Subsections (d-2) and (d-3), divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region. An electric utility subject to the freeze period imposed by Section 39.052 may treat transmission costs in excess of transmission revenues during the freeze period as an expense for purposes of determining annual costs in the annual report filed under Section 39.257. Notwithstanding Section 36.201, the commission may approve wholesale rates that may be periodically adjusted to ensure timely recovery of transmission investment. Notwithstanding Section 36.054(a), if the commission determines that conditions warrant the action, the commission may authorize the inclusion of construction work in progress in the rate base for transmission investment required by the commission under Section 39.203(e).

(d-1) The commission by rule shall establish a reasonable allowance for transmission-owning utility costs incurred to interconnect generation resources directly with the ERCOT transmission system at transmission voltage. The allowance must take into account:

(1) the potential to reduce the costs to consumers of generation interconnection;

(2) historical generation interconnection costs; and

(3) any other factor that the commission considers reasonable to accomplish the goal of this subsection.

(d-2) Costs in excess of the transmission-owning utility allowance provided by Subsection (d-1) incurred to interconnect generation resources with the ERCOT transmission system must be directly assigned to and collected from the generation resource interconnecting through the facilities.

(d-3) Not later than September 1 of every fifth year, the commission shall review and may adjust the allowance provided by Subsection (d-1) to account for inflation or supply chain issues.

(e) In this section, "ancillary services" means services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule.

(f) The commission shall ensure that ancillary services necessary to facilitate the transmission of electric energy are available at reasonable prices with terms and conditions that are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive. On the introduction of customer choice in the ERCOT power region, acquisition of generation-related ancillary services on a nondiscriminatory basis by the independent organization in ERCOT on behalf of entities selling electricity at retail shall be deemed to meet the requirements of this subsection.

(g) The commission shall:

(1) review the type, volume, and cost of ancillary services to determine whether those services will continue to meet the needs of the electricity market in the ERCOT power region; and

(2) evaluate whether additional services are needed for reliability in the ERCOT power region while providing adequate incentives for dispatchable generation.

(h) The commission shall require the independent organization certified under Section 39.151 for the ERCOT power region to modify the design, procurement, and cost allocation of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis.

**Credits**

Acts 1997, 75th Leg., ch. 166, § 1, eff. Sept. 1, 1997. Amended by Acts 1999, 76th Leg., ch. 405, § 17, eff. Sept. 1, 1999; Acts 2003, 78th Leg., ch. 295, § 1, eff. June 18, 2003; Acts 2021, 87th Leg., ch. 426 (S.B. 3), § 14, eff. June 8, 2021; Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 9, eff. Sept. 1, 2023.

Notes of Decisions (6)

V. T. C. A., Utilities Code § 35.004, TX UTIL § 35.004

Current through legislation effective June 12, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 5

16 Tex. Admin. Code § 25.192

Texas Administrative Code
  Title 16. Economic Regulation
    Part 2. Public Utility Commission of Texas
      Chapter 25. Substantive Rules Applicable to Electric Service Providers
        Subchapter I. Transmission and Distribution
          Division 1. Open-Access Comparable Transmission Service for Electric Utilities in the Electric Reliability Council of Texas

16 TAC § 25.192

§ 25.192. Transmission Rates for Export from ERCOT

Currentness

(a) Tariffs. Each transmission service provider (TSP) shall file a tariff for transmission service to establish its rates and other terms and conditions and shall apply its tariffs and rates on a non-discriminatory basis. The tariff shall apply to all distribution service providers (DSPs) and any entity scheduling the export of power from the Electric Reliability Council of Texas (ERCOT) region. The tariff shall not apply to any entity engaging in wholesale storage as described by §25.501(m) of this title (relating to Wholesale Market Design for the Electric Reliability Council of Texas) (storage entity).

(b) Charges for transmission service delivered within ERCOT. DSPs, excluding storage entities, shall incur transmission service charges pursuant to the tariffs of the TSP.

(1) A TSP's transmission rate shall be calculated as its commission-approved transmission cost of service divided by the average of ERCOT coincident peak demand for the months of June, July, August and September (4CP), excluding the portion of coincident peak demand attributable to wholesale storage load. A TSP's transmission rate shall remain in effect until the commission approves a new rate. The TSP's annual rate shall be converted to a monthly rate. The monthly transmission service charge to be paid by each DSP is the product of each TSP's monthly rate as specified in its tariff and the DSP's previous year's average of the 4CP demand that is coincident with the ERCOT 4CP.

(2) Payments for transmission services shall be consistent with commission orders, approved tariffs, and §25.202 of this title (relating to Commercial Terms for Transmission Service).

(c) Transmission cost of service. The transmission cost of service for each TSP shall be based on the expenses in Federal Energy Regulatory Commission (FERC) expense accounts 560-573 (or accounts with similar contents or amounts functionalized to the transmission function) plus the depreciation, federal income tax, and other associated taxes, and the commission-allowed rate of return based on FERC plant accounts 350-359 (or accounts with similar contents or amounts functionalized to the transmission function), less accumulated depreciation and accumulated deferred federal income taxes, as applicable.

(1) The following facilities are deemed to be transmission facilities:

(A) power lines, substations, reactive devices, and associated facilities, operated at 60 kilovolts or above, including radial lines operated at or above 60 kilovolts, except the step-up transformers and a protective device associated with the interconnection from a generating station to the transmission network;

(B) substation facilities on the high side of the transformer, in a substation where power is transformed from a voltage higher than 60 kilovolts to a voltage lower than 60 kilovolts;

(C) the portion of the direct-current interconnections with areas outside of the ERCOT region (DC ties) that are owned by a TSP in the ERCOT region, including those portions of the DC tie that operate at a voltage lower than 60 kilovolts; and

(D) capacitors and other reactive devices that are operated at a voltage below 60 kilovolts, if they are located in a distribution substation, the load at the substation has a power factor in excess of 0.95 as measured or calculated at the distribution voltage level without the reactive devices, and the reactive devices are controlled by an operator or automatically switched in response to transmission voltage.

(E) As used in subparagraphs (A)-(D) of this paragraph, reactive devices do not include generating facilities.

(2) For municipally owned utilities, river authorities, and electric cooperatives, the commission may permit the use of the cash flow method or other reasonable alternative methods of determining the annual transmission revenue requirement, including the return element of the revenue requirement, consistent with the rate actions of the rate-setting authority for a municipally owned utility.

(3) For municipally owned utilities, river authorities, and electric cooperatives, the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP.

(4) A municipally owned utility that is required to apply for a certificate of public convenience and necessity to construct, install, or extend a transmission facility within ERCOT pursuant to §25.101 of this title (relating to Certification Criteria) is entitled to recover, through the utility's wholesale transmission rate, reasonable payments made to a taxing entity in lieu of ad valorem taxes on that transmission facility, provided that:

(A) The utility enters into a written agreement with the governing body of the taxing entity related to the payments;

(B) The amount paid is the same as the amount the utility would have to pay to the taxing entity on that transmission facility if the facility were subject to ad valorem taxation;

(C) The governing body of the taxing entity is not the governing body of the utility; and

(D) The utility provides the commission with a copy of the written agreement and any other information that the commission considers necessary in relation to the agreement.

(5) The commission may adopt rate-filing requirements that provide additional details concerning the costs that may be included in the transmission costs and how such costs should be reported in a proceeding to establish transmission rates.

(d) Billing units. No later than December 1 of each year, ERCOT shall determine and file with the commission the current year's average 4CP demand for each DSP, or the DSP's agent for transmission service billing purposes, as appropriate, excluding the portion of coincident peak demand attributable to wholesale storage load. This demand shall be used to bill transmission service for the next year. The ERCOT average 4CP demand shall be the sum of the coincident peak of all of the ERCOT DSPs, excluding the portion of coincident peak demand attributable to wholesale storage load, for the four intervals coincident with ERCOT system peak for the months of June, July, August, and September, divided by four. As used in this section, a DSP's average 4CP demand is determined from the total demand, coincident with the ERCOT 4CP, of all customers connected to a DSP, including load served at transmission voltage, but excluding the load of wholesale storage entities. The measurement of the coincident peak shall be in accordance with commission-approved ERCOT protocols.

(e) Transmission rates for exports from ERCOT. A transmission service charge for exports of power from ERCOT must be assessed to transmission service customers for transmission service within the boundaries of the ERCOT region, in accordance with this section and the ERCOT protocols.

(1) A transmission service customer must be assessed a transmission service charge for the use of the ERCOT transmission system in exporting power from ERCOT based on scheduled exports and the rates established under subsections (c) and (d) of this section. The intervals must consist of one hour.

(2) The hourly transmission rate for exports from ERCOT will be the TSP's annual rate established under subsections (c) and (d) of this section divided by 8760.

(3) The entity scheduling the export of power over a DC tie is solely responsible to the TSP for payment of transmission service charges under this subsection.

(4) Beginning with the January 2023 reporting month, ERCOT must file a public report with the commission stating the total amount of energy imported and the total amount of energy exported over each DC tie for the calendar month. The report must also include the total amount of energy exported from the ERCOT region during the reporting month and each of the preceding 11 calendar months, reported by scheduling entity. Each report must be filed within 45 days of the end of the reporting month.

(f) Transmission revenue. Revenue from the transmission of electric energy out of the ERCOT region over the DC ties that is recovered under subsection (e) of this section shall be credited to all transmission service customers as a reduction in the transmission cost of service for TSPs that receive the revenue.

(g) Revision of transmission rates. Each TSP in the ERCOT region shall periodically revise its transmission service rates to reflect changes in the cost of providing such services. Any request for a change in transmission rates shall comply with the filing requirements established by the commission under this section.

(h) Interim Update of Transmission rates.

(1) Frequency. Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to §25.193 pursuant to an order in Project Number 37909, Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF), that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a commission-authorized rate of return, an appropriate rate of return shall be used.

(2) Reconciliation. An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the TSP's rate of return authorized in that complete review.

(3) Future consideration of effect on TSP's financial risk and rate of return. For a TSP that has increased its rates pursuant to paragraph (1) of this subsection, the commission may, in setting rates in the next complete review of the TSP's transmission cost of service, expressly consider the effects of reduced regulatory lag resulting from the interim updates to the TSP's rates and the concomitant impact on the TSP's financial risk and rate of return.

(4) Commission processing of application. The commission shall process an application filed pursuant to paragraph (1) of this subsection in the following manner.

(A) Notice and intervention deadline. The applicant shall provide notice of its application to all parties in the applicant's last complete review of the applicant's transmission cost of service and all of the distribution service providers listed in the last docket in which the commission set the annual transmission service charges for the Electric Reliability Council of Texas. The intervention deadline shall be 21 days from the date service of notice is completed.

(B) Sufficiency of application. A motion to find an application materially deficient shall be filed no later than 21 days after an application is filed. The motion shall be served on the applicant by hand delivery, facsimile transmission,

or overnight courier delivery, or by e-mail if agreed to by the applicant or ordered by the presiding officer. The motion shall specify the nature of the deficiency and the relevant portions of the application, and cite the particular requirement with which the application is alleged not to comply. The applicant's response to a motion to find an application materially deficient shall be filed no later than five working days after such motion is received. If within ten working days after the deadline for filing a motion to find an application materially deficient, the presiding officer has not filed a written order concluding that material deficiencies exist in the application, the application is deemed sufficient.

(C) Review of application. A proceeding initiated pursuant to paragraph (1) of this subsection is eligible for disposition pursuant to §22.35(b)(1) of this title (relating to Informal Disposition). If the requirements of §22.35 of this title are met, the presiding officer shall issue a notice of approval within 60 days of the date a materially sufficient application is filed unless good cause exists to extend this deadline or the presiding officer determines that the proceeding should be considered by the commission.

(5) Filing Schedule. The commission may prescribe a schedule for providers of transmission services to file proceedings to revise the rates for such services.

(6) DSP's right to pass through changes in wholesale rates. A DSP may expeditiously pass through to its customers changes in wholesale transmission rates approved by the commission, pursuant to §25.193 of this title (relating to Distribution Service Provider Transmission Cost Recovery Factors (TCRF)).

(7) Reporting requirements. TSPs shall file reports that will permit the commission to monitor their transmission costs and revenues, in accordance with any filing requirements and schedules prescribed by the commission.

**Credits**
**Source:** The provisions of this §25.192 adopted to be effective April 13, 1999, 24 TexReg 2874; amended to be effective September 30, 1999, 24 TexReg 8162; amended to be effective December 29, 1999, 24 TexReg 11722; amended to be effective June 20, 2001, 26 TexReg 4440; amended to be effective August 25, 2010, 35 TexReg 7195; amended to be effective April 18, 2012, 37 TexReg 2613; amended to be effective July 5, 2016, 41 TexReg 4805; amended to be effective December 20, 2022, 47 TexReg 8267.

Current through 50 Tex.Reg. No. 3526, dated June 6, 2025, as effective on or before June 13, 2025. Some sections may be more current. See credits for details.

16 TAC § 25.192, 16 TX ADC § 25.192

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

James McCarley on behalf of Jordan Pratt
Bar No. 24140277
scott.mccarley@oag.texas.gov
Envelope ID: 103118946
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Response Brief of Cross Appellee PUCT
Status as of 7/15/2025 7:03 AM CST

Associated Case Party: Texas Industrial Energy Consumers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Katherine Coleman | 24059596 | kcoleman@omm.com | 7/14/2025 6:01:15 PM | SENT |
| Michael McMillin | | mmcmillin@omm.com | 7/14/2025 6:01:15 PM | SENT |
| John Hubbard | | jhubbard@omm.com | 7/14/2025 6:01:15 PM | SENT |

Associated Case Party: City of Denton

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jamie Mauldin | 24065694 | jmauldin@lglawfirm.com | 7/14/2025 6:01:15 PM | SENT |
| Gabrielle Smith | 24093172 | gsmith@lglawfirm.com | 7/14/2025 6:01:15 PM | SENT |
| Jose E.de la Fuente | | jdelafuente@lglawfirm.com | 7/14/2025 6:01:15 PM | SENT |
| Amy Hoffee | | amy.hoffee@cityofdenton.com | 7/14/2025 6:01:15 PM | SENT |
| Marcella Lunn | | marcella.lunn@cityofdenton.com | 7/14/2025 6:01:15 PM | SENT |
| Roslyn Warner | | rwarner@lglawfirm.com | 7/14/2025 6:01:15 PM | SENT |
| Devin Alexander | | devin.alexander@cityofdenton.com | 7/14/2025 6:01:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Laurent | | david.laurent@oag.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| James ScottMcCarley | | scott.mccarley@oag.texas.gov | 7/14/2025 6:01:15 PM | SENT |

Associated Case Party: Public Utility Commission of Texas

_____

_____

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

James McCarley on behalf of Jordan Pratt
Bar No. 24140277
scott.mccarley@oag.texas.gov
Envelope ID: 103118946
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Response Brief of Cross Appellee PUCT
Status as of 7/15/2025 7:03 AM CST

Associated Case Party: Public Utility Commission of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John RHulme | | John.Hulme@oag.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 7/14/2025 6:01:15 PM | SENT |

Associated Case Party: Office of Public Utility Counsel

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Chris Ekoh | | chris.ekoh@opuc.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| Justin Swearingen | | justin.swearingen@opuc.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| Christiana Segura | 24143396 | christiana.segura@opuc.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| Michael Martinez | | michael.martinez@opuc.texas.gov | 7/14/2025 6:01:15 PM | SENT |
| Sharbel Sfeir | | sharbel.sfeir@opuc.texas.gov | 7/14/2025 6:01:15 PM | SENT |